640 F.2d 511
 Ronald H. ROSS, a minor suing by and through his next friend
and mother,
Plaintiffs-Appellees, Katherine Ross Merrell, as
Administratrix of the Estate of Richard G. Ross,
Plaintiff-Appellee-Appellant,
v.
UNITED STATES of America, Defendant-Appellant-Appellee.
 No. 78-3753.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 Jan. 19, 1981.
 Susan A. Ehrlich, Leonard Schaitman, Attys., App. Staff, Civ. Div., Dept. of Justice, Washington, D. C., for defendant-appellant-appellee.
 Joseph J. Boswell, Mobile, Ala., for plaintiffs-appellees.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before KRAVITCH and FRANK M. JOHNSON, Jr., Circuit Judges, and ALLGOOD*, District Judge.
 PER CURIAM:
 
 
 1
 The decision appealed from is AFFIRMED on the basis of the Opinion and Order of District Judge Virgil Pittman, filed on September 28, 1978, and attached hereto as an Appendix.
 
 
 2
 AFFIRMED.
 
 APPENDIX
 IN THE UNITED STATES DISTRICT COURT FOR
 THE SOUTHERN DISTRICT OF ALABAMA
 SOUTHERN DIVISION
 KATHARINE ROSS MERRELL )
 
 3
 as Administratrix, )
 
 
 4
 )
 
 Plaintiff, )
 
 5
 ) CIVIL ACTION
 
 V. )
 
 6
 ) No. 77-143-P
 
 UNITED STATES OF AMERICA, )
 
 7
 )
 
 Defendant. )
 RONALD H. ROSS, a minor, )
 
 8
 et al., )
 
 
 9
 )
 
 Plaintiff, )
 
 10
 ) CIVIL ACTION
 
 V. )
 
 11
 ) No. 77-144-P
 
 UNITED STATES OF AMERICA, )
 
 12
 )
 
 Defendant. )
 Jean P. Ross, )
 
 13
 )
 
 Plaintiff, )
 
 14
 ) CIVIL ACTION
 
 V. )
 
 15
 ) No. 77-145-P
 
 UNITED STATES OF AMERICA, )
 
 16
 )
 
 Defendant. )
 OPINION AND ORDER
 
 17
 PITTMAN, Chief Judge.
 
 
 18
 These three consolidated actions arose out of an airplane crash that occurred at Bates Field in Mobile, Alabama in the late afternoon of December 23, 1974. All of the suits are based on the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. Jurisdiction is invoked pursuant to 28 U.S.C. § 1346(b).
 
 
 19
 Prior to the filing of these lawsuits, each plaintiff filed a timely claim with the Federal Aviation Administration (FAA), as required by 28 U.S.C. § 2675(a). Each claim was thereafter denied by the FAA.
 
 
 20
 The plaintiffs' complaints all contain two causes of action-one of simple negligence, the other of wanton negligence. The complained of negligent acts were allegedly perpetrated by a federal employee of the FAA, an air traffic controller in the tower at Bates Field, on the date of the crash. Richard G. Ross, plaintiff Katherine Ross Merrell's testator, was piloting his airplane toward the airfield when he requested the tower to quote the Minimum Descent Altitude (MDA)[1] within the approach area at Bates Field. The tower, the plaintiffs charge, misstated the MDA and the plane subsequently collided with electric power transmission lines and crashed.
 
 
 21
 Plaintiff Katherine Ross Merrell as administratrix of her father's estate seeks damages of $700,000.00 on each count. Plaintiff Ronald H. Ross, who was accompanying his father on the flight and survived the accident, seeks damages of one million dollars ($1,000,000.00) on each of the two counts. Plaintiff Jean P. Ross, widow of the pilot and mother of Ronald, seeks $60,000.00 on each count for the medical bills and expenses incurred in the treatment of her son as well as other injuries.
 
 FINDINGS OF FACT
 
 22
 On December 23, 1974, Richard G. Ross (Ross), a resident of Maitland, Florida, rented a single-engine airplane, a Piper Comanche with Registration Mark 9168P, from the Showalter Flying Service of Orlando, Florida.
 
 
 23
 Ross held an FAA private pilot certificate with ratings of airplane single engine land, airplane single engine sea, and instrument rating. In the six-month period before December 23, 1974, Ross had flown less than six (6) hours of instrument flying time according to his own logbooks (Plaintiffs' Exhibit # 18). Consequently, under FAA regulations, Ross was potentially not "current" with regard to Instrument Flight Rules (IFR),[2] 14 C.F.R. § 61.57(e)(1).[3] However, the plaintiffs offered evidence Ross was "current" under § 61.57(e) by the alternate method of a competency check. Mr. Charles Parker testified he certified Ross to fly IFR four days before the crash on December 19, 1974, but there was no record of such a competency check in Ross' logbook as required by FAA rules in FAA Advisory Circular No. 61-65, p. 8 (Sept. 5, 1973).[4] Mr. Parker explained the absence of an indorsement on his postponement of the recordation until rubber stamps embossed with the language required by A.C. 61-65 were obtained.
 
 
 24
 The attorneys for the defendant argued at trial that Ross' alleged violation of FAA regulation 14 C.F.R. § 61.57(e) demonstrated negligence on his part. It is the finding of this court that Ross underwent a competency check within a week of the crash and, by the regulations, was therefore "current" with reference to IFR. This court has no reason to doubt the veracity of Mr. Parker who administrated the flight examination and who, if anyone, was negligent in failing to indorse Ross' logbooks.
 
 
 25
 Pilot Ross, before departing Orlando, filed a Visual Flight Rules (VFR)[5] flight plan. At approximately 2:00 p. m. Central Standard Time, Ross left Herndon Airport in Orlando, accompanied by his then fifteen year old son, plaintiff Ronald H. Ross, with a destination of Lakefront Airport in New Orleans, Louisiana.
 
 
 26
 About two and a half hours into the flight, Ross encountered inclement weather and contacted the Crestview, Florida Flight Service Station. Ross changed his flight plan from VFR to IFR (see footnote 2) and received the following weather information:
 
 
 27
 "New Orleans SIGMET[6] BRAVO 2 -flight precautions. Over Tennessee Arkansas, Louisiana, Mississippi and Alabama for embedded thunderstorms. Generally west of line Nashville-Mobile embedded thunderstorms will increase and continue past 2000; New Orleans AIRMET[7] ALPHA 4-flight precautions. Over Arkansas, Louisiana, Coastal Mississippi, Coastal Alabama and Florida west of 85 degrees and coastal waters for IFR conditions. Over area west and south of line Jonesboro, Arkansas-Baton Rouge-Pensacola ceilings frequently below 1000 and visibility occasionally below 3 miles in stratus rain and fog will increase and continue past 2000; New Orleans AIRMET CHARLIE 4-flight precautions. Over Tennessee, Arkansas, Louisiana, Mississippi, Alabama and adjacent coastal waters for strong low level winds and turbulence. Generally west of line Crossville, Tennessee-Biloxi, Mississippi winds 30 knots or more within 2 thousand feet of surface and frequent moderate turbulence below about 10 thousand feet will continue past 2200; Mobile 1500 Weather-Measured ceiling 1,000 overcast visibility 7, temperature 65, dew point 62, wind 120 degrees at 9, altimeter 30.12; New Orleans 1500 Weather-1,200 scattered, estimated 2,500 broken 8,000 overcast, visibility 6 smoke, haze, temperature 71, dew point 68, wind 170 degrees at 15, altimiter 30.02; and New Orleans Terminal Forecast-1600, 500 scattered, ceiling 1,500 broken, 8,000 overcast, visibility 5 smoke, haze, wind 180 degrees at 10 gusts 20, scattered variable broken, chance ceiling 500 overcast, visibility 1 thunderstorm moderate rain showers. 1800 ceiling 500 broken 1,200 overcast, visibility 3 fog, wind 180 degrees at 10 gusts 20, chance moderate rain showers/thunderstorm moderate rain showers. 2100 ceiling 400 overcast, visibility 2 fog, variable ceiling 200 sky obscured, visibility 1 fog, wind 180 degrees at 15, chance moderate rain showers/thunderstorm moderate rain showers. 1100 IFR ceiling becoming marginal VFR ceiling by 1300."
 
 
 28
 (Plaintiffs' and Defendant's Exhibit # 35, National Transportation Safety Board Accident Report, pp. 8-8a.)
 
 
 29
 An hour later Ross obtained additional weather information from air traffic controllers in Houston, Texas. The Houston Control Center informed Ross that he was entering an area of very heavy precipitation. In response to this advisory, Ross requested that he be vectored around the weather. Houston Control recommended a heading 040 degrees for a vector north of the weather area and Ross agreed.
 
 
 30
 A few minutes later Houston Control inquired about Ross' flight conditions and he reported he was still in the rain. Ross then requested any available landing site to which Houston would vector him. Houston advised Ross that his best bet might be Bates Field if he desired to land. Ross accepted the suggestion and Houston Control assigned him an altitude and heading toward Mobile. Houston Control furthermore initiated a radar hand-off with Mobile Approach Control.
 
 
 31
 At trial the counsel for defendant contended that pilot Ross exhibited negligent conduct in continuing the flight on December 23, 1974, after repeated advisories of inclement weather in his projected flight path. It is the finding of this court, however, that with only AIRMET flight precautions for the area, Ross was justified in proceeding toward his original destination. In the continued flight to New Orleans he faced heavy precipitation and sought the first landing site in the area although the decision proved to be disastrous for him.
 
 
 32
 Houston Control thereafter instructed Ross to contact Mobile Approach Control and Ross acknowledged these instructions. Mobile Approach Control was contacted by Ross and it confirmed radar identification of his aircraft. Mobile Approach Control also gave Ross a vector for an Instrument Landing System (ILS)[8] approach to Runway 14 at Bates Field. At 5:14 p. m. CST Mobile Approach Control advised Ross of the weather at Bates Field: a measured ceiling of 600 feet overcast, visibility four (4) miles, light rain and fog, wind 120 degrees at fifteen (15) knots and the altimeter setting of 30.13 inches. Ross acknowledged receipt of this weather information.
 
 
 33
 At 5:15:30 p. m. Ross requested Mobile Approach Control to give him the runway and the approach plate he would need.[9] Five seconds later Mobile Approach Control advised Ross his approach would be an ILS approach straight in to Runway 14. At 5:17:25 p. m. Mobile Approach Control vectored Ross toward the localizer course. At 5:17:40 p. m. Ross was told that, upon his interception of the localizer, he was to proceed inbound on the localizer. In addition, Mobile Approach Control advised Ross, "you are cleared for an ILS approach." (Plaintiffs' Exhibit # 9). The aircraft flown by Ross was equipped with instruments to enable Ross to execute the type of instrument landing for which he was cleared.
 
 
 34
 At 5:17:45 p. m. Ross requested the localizer frequency and stated, "I'm kinda busy here." (Plaintiffs' Exhibit # 9). Five seconds later Mobile Approach Control gave Ross the localizer frequency. At 5:18 Mobile Approach Control instructed Ross to proceed inbound on the localizer and asked Ross for his present altitude which he responded was 3000 feet.
 
 
 35
 At 5:19:20 Mobile Approach Control asked Ross if he were picking up the localizer without difficulty and Ross acknowledged he was. Five seconds later, Mobile Approach Control advised Ross he was 7.5 miles from the outer marker.[10] Mobile Approach Control then asked Ross to report his altitude which Ross communicated to be approaching 2000 feet.
 
 
 36
 At 5:21:50 p. m. Mobile Approach Control communicated to Mobile Local Control, the tower, with regard to the runway and approach lights, "Might turn up all them lights pretty high again this Six Eight Papa I don't think he's ahh too sure about hisself." (Plaintiffs' Exhibit # 9). At 5:21:55 the tower advised Approach Control that all the lights were "on a high step and I'll light a candle if he needs it." (Plaintiffs' Exhibit # 9). Mobile Approach Control advised Ross at 5:23:30 that he was three (3) miles from the outer marker. Ross requested notification when he was over the outer marker at 5:25:15. Five seconds later Mobile Approach Control acknowledged the request, advised Ross he was 1.5 miles outside the outer marker and asked him if he were level at 1800 feet. At 5:25:25 Ross confirmed he was level at that altitude.
 
 
 37
 At 5:25:30 Mobile Approach Control advised the tower at Bates Field that it was transferring Ross to Mobile Local Control and that Ross wanted to be notified of his location when he was over the outer marker. The tower acknowledged this message at 5:25:35.
 
 
 38
 At 5:26:10 Ross made his initial contact with the tower. Ten seconds later the tower informed Ross that he was one mile from the outer marker and inquired if he heard the tower. At 5:26:25 Ross replied that he heard the tower and added "we're kinda busy." (Plaintiffs' Exhibit # 10).
 
 
 39
 The plaintiffs contended at trial that pilot Ross' two statements about being "kinda busy" to Mobile Approach Control at 5:17:45 p. m. and to the tower at 5:26:25 p. m. along with the declaration by Mobile Approach Control to the tower at 5:21:50 p. m. that the former did not think Ross "was too sure about hisself" should have prompted the tower to implement emergency procedures pursuant to the FAA Manual Terminal Air Traffic Control (TATC), para. 1800, p. 219, which provides:
 
 
 40
 "EMERGENCY DETERMINATIONS. When you believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions in this manual. If you are in doubt that a given situation constitutes a potential emergency, handle it as though it were an emergency."
 
 
 41
 The TATC provisions such as paragraph 1800 have the effect of FAA regulations since 14 C.F.R. § 65.45(a) states:
 
 
 42
 "An air traffic control tower operator shall perform his duties in accordance with the ... procedures and practices prescribed in air traffic control manuals of the FAA...."
 
 
 43
 This court finds that the statements made by Ross and Mobile Approach Control did not combine to warrant the initiation of emergency procedures by the tower, and, therefore, the failure of the tower to do so did not constitute negligence.
 
 
 44
 At 5:27:15 Ross asked the tower to confirm the Decision Height (DH).[11] At 5:27:20 the tower informed Ross he was over the outer marker and inbound. The tower responded to Ross' earlier inquiry about the DH at 5:27:35 and stated the decision height was k418 feet Mean Sea Level (MSL).
 
 
 45
 At 5:28:05 p. m. Ross asked the tower to confirm 560 feet as the Minimum Descent Altitude (MDA), (see footnote 1), a term used in a non-precision or "localizer only" approach for which Ross was not cleared. At 5:28:10 the tower answered, "minimum descent altitude-four eighteen four eighteen MSL." (418 feet MSL). (Plaintiffs' Exhibit # 10). The figure quoted by the tower was incorrect. On December 23, 1974, the MDA for Runway 14 at Bates Field was actually k 560 feet MSL.
 
 
 46
 At 5:29:10 p. m. the tower stated it had lost the localizer. The localizer was lost because between 5:28:10 and 5:29:10 Ross' plane collided with electric power lines that were 55.7 feet above the ground,[12] or 267.75 feet MSL, (Plaintiffs' Exhibit # 24) in the proximity of Bates Field.
 
 
 47
 The parties agreed at trial, however, that the height of these lines was in accordance with FAA regulations on obstacle clearance. 14 C.F.R. § 77.21 et seq.
 
 
 48
 The plaintiffs advanced the argument at trial that the defendant failed to provide a sufficient buffer zone of obstacle clearance at Bates Field. To support this position the plaintiffs relied on the FAA Manual entitled United States Standard for Terminal Instrument Procedures (TERPS ) (2d ed. 1970), (Plaintiffs' Exhibit # 4). Paragraph 954 in TERPS provides:
 
 
 49
 "The minimum obstacle clearance in the final approach area shall be 250 feet. In addition, the MDA established for the final approach area shall assure that no obstacles penetrate the transitional surfaces. The transitional surfaces in localizer-only type approaches begin at a height not less than 250 feet below the MDA."
 
 
 50
 Id. at p. 77.
 
 
 51
 The plaintiffs contend that, since the MDA at Bates Field was k 418 feet MSL and the power lines with which Ross collided stood at a height of k 267.75 MSL, the 250 feet obstacle clearance established in the TERPS Manual was not met. The TERPS Manual, however, consists of advisory criteria rather than binding FAA regulations. As the TERPS Manual's foreword states: "This publication prescribes standardized methods for use in designing instrument flight procedures." Id. at p. v. The TERPS Manual, then, should not be used by this court in the context of the case sub judice to determine negligence on the part of the defendant.
 
 
 52
 It is uncontroverted, too, that Ross descended substantially below both the actual DH and MDA altitude levels in contravention of FAA regulations. 14 C.F.R. § 91.117(b).[13] Significantly, had Ross maintained an altitude level of k 418 MSL, although incorrect with regard to MDA, he would not have collided with the power lines.
 
 
 53
 One explanation offered by the plaintiffs for the Ross plane's precipitate loss of altitude was the phenomenon of wind shears.[14] There was testimony and evidence adduced at trial that the available meteorological data from Bates Field on the date and at the time of the crash lent credence to the theory that wind shears accounted for the aircraft's abrupt and substantial fall. However, plaintiff Ronald Ross, son and passenger survivor, testified that while there was some turbulence on the final approach before the crash, there was none so great as to cause objects in the plane to bounce around the cockpit. Without more, this court is not persuaded that wind shears did, in fact, cause the Ross plane to suddenly lose a great deal of altitude.
 
 
 54
 After impact with the power lines, the plane fell to the ground and crashed. Pilot Richard G. Ross sustained fatal injuries in the accident and died on December 23, 1974. Plaintiff Ronald H. Ross, the pilot's son and the only passenger, suffered personal injuries in the crash and, to date, has incurred medical expenses in the sum of $18,423.85. The parties have agreed that these charges were related to the crash and that the fees were necessary and reasonable. As part of the medical treatment for his injuries, Ronald has undergone facial reconstruction that has entailed the implantation of silicone in his face in the months following the crash. Dr. Charles Ebert, a witness for the plaintiffs, testified at trial that with the use of silicone in this manner there always exists the possibility of the body's rejection of the silicone with attendant infection at some future date. This development would, of course, warrant additional medical attention and cause pain to the plaintiff.
 
 CONCLUSIONS OF LAW
 
 55
 Well-established doctrine in the Fifth Circuit dictates "(i)n deciding cases under (the Federal Tort Claims) Act the federal courts generally apply state law, since the Act directs federal courts to decide liability 'in accordance with the law of the place where the act or omission occurred,' 28 U.S.C. § 1346(b)...." Johnson v. United States, 576 F.2d 606, 610 (5th Cir. 1978). If governmental liability is found and damages are to be awarded, "(u)nder the Federal Tort Claims Act, determination of damages is governed by the law of the state in which the wrongful act occurred. 28 U.S.C. § 1346(b)." Neal v. United States, 562 F.2d 338, 341 (5th Cir. 1977). Thus, the law of Alabama, situs of the airplane crash, will be determinative in the treatment of the legal issues in the case sub judice.
 
 
 56
 Since the plaintiffs have alleged negligent conduct on the part of a Government employee, the substantive law of Alabama on negligence must be consulted to determine whether there is tort liability. Alabama case law states:
 
 
 57
 "In every action grounded upon negligence there are three essential elements to a right of recovery. First, a duty owed by the defendant to the plaintiff(s); second a breach of that duty; and third, an injury to plaintiff(s) in consequence of that breach."
 
 
 58
 Elba Wood Products, Inc. v. Brackin, 356 So.2d 119, 122 (Ala.1978).
 
 
 59
 What duty, if any, did the defendant United States, through its employee, owe pilot Ross and his passenger son. The Fifth Circuit, in this regard, has adopted a rather expansive view of a controller's duty:
 
 
 60
 "The government's duty to provide services with due care to airplane pilots may rest either upon the requirements of procedures manuals spelling out the functions of its air traffic controllers or upon general pilot reliance on the government for a given service."
 
 
 61
 Gill v. United States, 429 F.2d 1072, 1075 (5th Cir. 1970). (Emphasis supplied). The same applies to plaintiff Ronald Ross, although not a pilot, since "a controller's duty to exercise reasonable care extends to ... passengers...." Freeman v. United States, 509 F.2d 626, 629 (6th Cir. 1975); accord, American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969).
 
 
 62
 The Terminal Air Traffic Control Manual (Plaintiffs' Exhibit # 5), a "procedures manual" as referred to in Gill, nowhere states an explicit requirement that DH and MDA must be given by controllers upon request of a pilot. However, the Gill doctrine allows the inquiry on controller duties to proceed further. As evidenced by the transcripts of pilot-controller communications (Plaintiffs' Exhibit # 10), the controller confirmed the DH and then, upon request for a MDA, supplied an incorrect MDA. These actions, although not required in the TATC manual, were undertaken by the controller. Significantly, " '(i)t is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently.' " Hartz v. United States, 387 F.2d 870, 874 (5th Cir. 1968), quoting Ingham v. Eastern Airlines, Inc., 373 F.2d 227, 236 (2nd Cir. 1967). With an assumed duty on the part of the controller found, the first element requisite for a finding of negligence is satisfied.
 
 
 63
 The duty of giving the MDA voluntarily undertaken by the controller carries with it the attendant duty to give the correct MDA figure. When the controller transmitted to Richard Ross the incorrect MDA he breached that inherent duty and the second essential element of negligence was met.
 
 
 64
 The third and final element necessary for negligence to exist is that the breach of the duty owed the plaintiffs was the proximate cause of injuries sustained. Vines v. Plantation Motor Lodge, 336 So.2d 1338, 1339 (Ala.1976). To be the proximate cause of an injury, a negligent act must have been the "primary moving cause without which (the injury) would not have occurred...." City of Mobile v. Havard, 289 Ala. 532, 268 So.2d 805, 810 (1972). It is the finding of this court that the controller's report of the incorrect MDA occurred at a critical time and proximately contributed to the crash of the Ross plane and, therefore, constituted negligence.
 
 
 65
 Having found simple negligence on the part of the defendant, this court confronts the plaintiffs' allegation of wanton negligence on the part of the controller. This court is not persuaded to conclude that the controller was guilty of wantonness. The standards for wanton negligence as enunciated by the Alabama Supreme Court were not met. The state law on the subject demands that the controller's transmittal of incorrect information must have been done "with reckless indifference to the consequences of (the) act...." W. T. Ratliff Co. v. Purvis, 292 Ala. 171, 291 So.2d 289, 293 (1974). Such was not the case in the factual circumstances of this action. The defendant was not guilty of wantonness.
 
 
 66
 The defendant has raised the defense of contributory negligence on the part of the pilot Ross. Under Alabama law,
 
 
 67
 "it is well established that a plaintiff in a negligence case cannot recover notwithstanding that he may have proven negligence on the part of the defendant, where plaintiff's own negligence is shown by his or the defendant's proof to have proximately contributed to his damage, provided such contributory negligence is specially pleaded ...."
 
 
 68
 Alabama Power Co. v. Scholz, 283 Ala. 232, 215 So.2d 447, 452 (1968). The defendant contends that to strike the power lines, as the Ross plane did, pilot Richard Ross had to descend far below not only the DH of the ILS approach for which he was cleared but also the incorrectly reported MDA. Descending below the prescribed DH level violated an FAA regulation, 14 C.F.R. § 91.117(b) (set out in footnote 13), and, the defendant contends, demonstrates contributory negligence on Ross' part. Ross' descent below the DH was plainly negligent conduct as defined by the FAA regulations on safe flight procedures. "While principles of (state) law control (under the Federal Tort Claims Act), federal regulations may impose duties and standards of conduct upon the actors." Gill v. United States, 429 F.2d 1072, 1075 (5th Cir. 1970). Furthermore, he even descended below the erroneous MDA. Whether this negligence was contributory negligence depends upon its definition under Alabama law. The Supreme Court of Alabama has stated:
 
 
 69
 "(T)he three elements essential to contributory negligence are that the party charged with the contributory negligence (1) had knowledge of the condition or failure (2) appreciated the danger and (3) failed to exercise reasonable care in the premises, but with such knowledge and appreciation, put himself into the way of danger."
 
 
 70
 Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260, 263 (1975). It is the opinion of this court that pilot Ross fulfilled the standards for contributory negligence in that he knew of his rapidly descending movement toward Bates Field Runway 14, was aware of the necessity for maintaining prescribed approach altitudes for safety, and did not conduct his approach prudently so that he invited the type of disaster that took place. With contributory negligence on Richard Ross' part, his administratrix daughter's action is barred from recovering damages under Alabama law.
 
 
 71
 The fact that Richard Ross was found to be contributorily negligent and his representative unable to recover damages does not necessarily foreclose recovery on the part of plaintiff Ronald Ross, passenger in the plane. Under Alabama law "(i)t is axiomatic that any negligence which might be attributed to the (parent) cannot be imputed to the child." Alabama Power Co. v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975).
 
 
 72
 The Fifth Circuit has approved the holding in an Alabama case under the Federal Tort Claims Act that where a passenger is a passive participant in a flight, "(a)ny negligence of ... the pilot, will not be imputed to (the passenger)." Sullivan v. United States, 299 F.Supp. 621, 626 (N.D.Ala.1968), aff'd. in part, 411 F.2d 794 (5th Cir. 1969). Thus, Ronald's status as the contributorily negligent pilot's son and sole passenger have no bearing on his right of recovery.
 
 
 73
 The factual circumstances that both the controller and the pilot were negligent present no theoretical difficulty in determining the controller's tort liability with regard to Ronald's cause of action. The Supreme Court of Alabama has stated that it "recognizes the principle of concurrent negligence." Caudle v. Birmingham Elec. Co., 247 Ala. 34, 22 So.2d 417, 420 (Ala.1945). In elaborating on this doctrine and the principle of joint and several liability, the Caudle court quoted pertinent precedent:" '(I)f one is guilty of negligence and this negligence concurred or coalesced with the negligence of another, and the two combine to produce a given result, each is liable for the damages, and the negligence of each will be deemed the proximate cause of the injury producing the damages.' (citation omitted)
 
 
 74
 "This court has said: 'if damage has resulted directly from concurrent, wrongful acts of two persons, each of them may be counted on as the proximate cause, and the parties held responsible jointly or severally for the cause.' (citation omitted)"
 
 
 75
 Id.
 
 
 76
 More recently the state supreme court stated, "For the cause of an injury to be its proximate cause it need not be the sole proximate cause." Alabama Power Co. v. Taylor, supra, 306 So.2d at 249. It is the opinion of this court that the injuries Ronald sustained were the direct result of both the controller's negligence and his father's negligence.
 
 
 77
 As for the award of damages, the defendant Government may be held liable under Alabama law as follows, "a tortfeasor whose act or acts contribute in causing an injury may be held liable for the entire resulting loss." Beloit Corp. v. Harrell, 339 So.2d 992, 995 (Ala.1976).
 
 
 78
 As stated above, Alabama substantive law on damages is employed in the computation of an appropriate award under the Federal Tort Claims Act to compensate the plaintiff Ronald Ross for his loss due to the defendant's negligence. A review of Alabama case law provides this court with guidance. The basic policy underlying damages was stated recently: The general rule is that compensatory damages are intended to reimburse the plaintiff for loss suffered by reason of the injury inflicted by the defendant...." Hardy Ins. Co. v. Baumhauer-Croom, Inc., 339 So.2d 584, 586-87 (Ala.Civ.App.1976).
 
 
 79
 The various components that enter into the measurement of damages in personal injury cases have been addressed in numerous Alabama opinions. As for doctors' bills and other medical expenses, the Alabama courts have declared, " 'In every case where a party has incurred expense as the result of another's wrong, only so much is recoverable therefor as is a reasonable and proper amount under the circumstances.' " Birmingham Amusement Co. v. Norris, 216 Ala. 138, 112 So. 633, 636 (Ala.1927) quoted in Foodtown Stores, Inc. v. Patterson, 282 Ala. 477, 213 So.2d 211, 217 (1968). Where, as with the plaintiff Ronald Ross, continuing medical attention will be required to deal with permanent and potentially troublesome injuries, the Alabama courts have allowed the award of damages to incorporate these projected costs. "(T)he expense of future medical treatment required for the injury sustained by plaintiff is a proper element of damages in an action for injury to the person." Fleming v. Knowles, 272 Ala. 271, 130 So.2d 326, 328 (1961). In addition, the courts of this State have allowed as one factor any encumbrances to the plaintiff's working capacity caused by the injury in computing damages. "As a general rule, in a personal injury action, the loss of the value of time or earning power of the plaintiff is (an) element to be considered in the measure of damages...." Fitzpatrick v. Dean, 278 Ala. 284, 177 So.2d 909, 910 (1965).
 
 
 80
 The two elements that have been recognized as proper in the assessment of damages but have defied easy estimation are pain and suffering. "There is no fixed standard for ascertainment of compensatory damages recoverable here for physical pain and mental suffering...." Alabama Power Co. v. Mosley, 318 So.2d 260, 266 (Ala.1975). Normally, these factors are left to a jury to assign a value to their worth, but a court must draw upon its reasoning powers and, more importantly, its sensitivity to arrive at an appropriate level of compensation for these elements.
 
 
 81
 With all of these factors in mind, it is the opinion of this court that the plaintiff Ronald Ross is entitled to an award of $95,000.00 in damages.
 
 
 82
 As for Mrs. Ross' separate action, it is the opinion of this court that she is entitled to an award of damages for the medical expenses amounting to $18,423.85 that she incurred for Ronald's treatment and recovery. The same legal principles concerning negligence, concurrent negligence, and contributory negligence discussed above are applicable to her cause of action. Future medical expenses are provided for in Ronald's damages due to his age.
 
 
 83
 It is therefore ORDERED, ADJUDGED, and DECREED that the defendant is entitled to judgment in Civil Action No. 77-143-P brought by plaintiff Katherine Ross Merrell.
 
 
 84
 It is further ORDERED, ADJUDGED, and DECREED that the plaintiff Ronald H. Ross is entitled to an award of $95,000.00 as damages against the defendant in Civil Action No. 77-144-P brought on his behalf by his mother.
 
 
 85
 It is further ORDERED, ADJUDGED, and DECREED that plaintiff Jean P. Ross is entitled to an award of $18,423.85 as damages against the defendant in Civil Action No. 77-145-P.
 
 
 86
 All costs are taxed to the defendant.
 
 
 87
 Done, this the 28 day of September, 1978.
 
 
 
 *
 District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 Minimum Descent Altitude is "the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure where no electronic glide slope is provided." Pilot/Controller Glossary, FAA, p. 24 (attached to defendant's trial brief) (hereinafter Glossary)
 
 
 [2]
 Instrument Flight Rules are "(r)ules governing the procedures for conducting instrument flight (and) a term used by pilots and controllers to indicate type of flight plan." Glossary, p. 21
 
 
 [3]
 14 C.F.R. § 61.57(e) provides:
 "(e) Instrument-(1) Recent IFR experience. No pilot may act as pilot in command under IFR, nor in weather conditions less than the minimums prescribed for VFR, unless he has, within the past 6 months-
 (i) In the case of an aircraft other than a glider, logged at least 6 hours of instrument time under actual or simulated IFR conditions, at least 3 of which were in flight in the category of aircraft involved, including at least six instrument approaches, or passed an instrument competency check in the category of aircraft involved."
 (Emphasis supplied.)
 
 
 [4]
 FAA Advisory Circular 61-65 provides at page 8:
 "The person conducting the check should indorse the pilot's logbook upon the satisfactory accomplishment of an instrument competency check. That endorsement should read substantively as follows:
 mr./ms.____________ holder of pilot certificate no. 0000001 has SATISFACTORILY COMPLETED AN INSTRUMENT COMPETENCY CHECK ON 11/20/73
 s/s J. J. JONES 652372 CFI Exp. 11/30/73"
 
 
 [5]
 Visual flight rules are "(r)ules that govern procedures for conducting flight under visual conditions. The term 'VFR' is also used in the United States to indicate weather conditions that are equal to or greater than minimum VFR requirements. In addition, it is used by pilots and controllers to indicate type of flight plan." Glossary, p. 43
 
 
 [6]
 SIGMET/SIGNIFICANT METEOROLOGICAL INFORMATION is "(a) weather advisory issued concerning weather significant to the safety of all aircraft. SIGMET advisories cover tornadoes, lines of thunderstorms, embedded thunderstorms, large hail, severe and extreme turbulence, severe icing, and widespread dust or sandstorms that reduce visibility to less than 3 miles." Glossary, p. 36
 
 
 [7]
 AIRMET/AIRMAN'S METEOROLOGICAL INFORMATION consists of "(i)n-flight weather advisories which cover moderate icing, moderate turbulence, sustained winds of 30 knots or more within 2,000 feet of the surface and the initial onset of phenomena producing extensive areas of visibilities below 3 miles or ceilings less than 1,000 feet. It concerns weather phenomena which are of operational interest to all aircraft and potentially hazardous to aircraft having limited capability because of lack of equipment, instrumentation or pilot qualifications. It concerns weather of less severity than SIGMETs." Glossary, pp. 3-4
 
 
 [8]
 Instrument Landing System/ILS is a "precision instrument approach system consisting of the following electronic components and visual aids:
 
 
 [1]
 Localizer
 
 
 [2]
 Glide Slope
 
 
 [3]
 Outer Marker
 
 
 [4]
 Middle Marker
 
 
 [5]
 Approach Lights."
 Glossary, p. 21.
 
 
 [9]
 Ross had a copy of the approach plate for Bates Field onboard the aircraft. (Plaintiffs' Exhibit # 6). Printed on the Bates Field approach plate in his possession were both the Minimum Descent Altitude (MDA) and the Decision Height (DH) for Bates Field
 
 
 [10]
 The outer marker at Bates Field is 4.6 nautical miles from Runway 14. An Outer Marker is a "marker beacon at or near the glide slope intercept altitude of an ILS approach. It is keyed to transmit two dashes per second on a 400 Hz tons which is received aurally and visually by compatible airborne equipment." Glossary, p. 29. In other words, the outer marker emits an electronic signal that is received and heard in the cockpit when the plane passes over the outside marker
 
 
 [11]
 Decision Height-"(w)ith respect to the operation of aircraft means, the height at which a decision must be made during an ILS or PAR instrument approach, to either continue the approach or execute a missed approach." Glossary, p. 14
 
 
 [12]
 The power lines were surveyed and platted and determined to be strung at a height of k 267.75 MSL. (Plaintiffs' Exhibit # 24). Bates Field is at k 218 feet MSL
 
 
 [13]
 14 C.F.R. § 91.117(b) provides:
 "Descent below MDA or DH.
 No person may operate an aircraft below the prescribed minimum descent altitude or continue on approach below the decision height unless-
 (1) The aircraft is in a position from which a normal approach to the runway of intended landing can be made; and
 (2) The approach threshold of that runway, or approach lights or other markings identifiable with the approach end of the runway, are clearly visible to the pilot.
 If upon arrival at the missed approach point or decision height, or at any time thereafter, any of the above requirements are not met, the pilot shall immediately execute the appropriate missed approach procedure."
 
 
 [14]
 A wind shear is a "change in wind speed and/or wind direction in a short distance, resulting in a tearing or shearing effect. It can exist in a horizontal or vertical direction and occasionally in both." Glossary, p. 44