# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

---

No. 01-60211

---

PATSYE PALOMO, As Wife of Tony E. Palomo, Deceased, As Natural Mother and Next Friend of Martin E. Palomo, a minor, and Anthony Sean Palomo, a minor, and As Administratrix of the Estate of Tony E. Palomo, Deceased; ANNA MARIA PALOMO, As Natural Daughter of Tony E. Palomo; AUTO CENTER INC.

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA

Defendant-Appellee.

---

CHRISTOPHER DRAKE MALONE PLUNKETT, A minor, by and through Rosa Plunkett, Next Friend, and Rosa Plunkett, Administratrix of the Estate of James Earl Plunkett, Deceased; ROSA PLUNKETT, Administratrix of the Estate of James Earl Plunkett, Deceased,

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA

Defendant-Appellee.

1

Appeal from the United States District Court
For the Southern District of Mississippi, Southern Division

(1:96-CV-329-GR; 1:97-CV-26-GR)

July 9, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

The wrongful death beneficiaries of airplane pilot Tony Palomo and passenger James Plunkett sued the United States under the Federal Tort Claims Act alleging that an air traffic controller's failure to assist Palomo caused the death of Palomo and Plunkett in an airplane crash. The district court found that the pilot's fault caused the crash and dismissed the suit. The beneficiaries appeal that ruling.

FACTS AND PROCEDURAL HISTORY

On July 5, 1994, Tony Palomo and James Plunkett set off from Hawkins Field in Jackson, Mississippi aboard a 1957 Beechcraft Bonanza airplane owned by Auto Center, Inc. intending to fly to Gainesville, Florida and then on to Orlando.[1] Palomo, the pilot, was flying under visual flight rules (VFR), in which a pilot uses his own vision to navigate the aircraft and is not permitted to fly into clouds.[2] Palomo had begun taking flight instruction in January 1993 and completed his training for a private pilot's certificate in July 1993. According to Palomo's flight instructor, Ken Swan, Palomo's training included instruction in how to communicate with air traffic controllers, how to

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1]Palomo owned and operated Auto Center, Inc.

[2]*Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1439 (5th Cir. 1990).

2

avoid flying into clouds, and how to obtain a pre-flight VFR weather briefing. During his training, Palomo purchased the Beechcraft Bonanza. Swan refused to provide Palomo with transition training for the Bonanza because he did no t think that Palomo had the experience necessary for flying the Bonanza, which was a more complicated aircraft than the one used in his training.

On July 5, 1994, Swan was at the Hawkins Airfield and recommended to Palomo that he not fly to Florida because of poor weather, including thunderstorms, along the route.[3]  Prior to the flight, Palomo received a weather briefing from an air traffic control specialist stationed at the Federal Aviation Administration (FAA) Flight Service Station in Jackson, Mississippi. The weather briefing included information about thunderstorm activity along Palomo's proposed route. Bri an Frazier, another flight instructor at the airfield that day, advised Palomo to wait until later that day or the following day to fly to Florida because of the weather. In Frazier's opinion, Palomo had exercised bad judgment about flying in inclement weather previously.

Despite these warnings, Palomo and Plunkett departed Hawkins Field at about 2 p.m. Palomo requested VFR flight-following service, an optional service in which the aircraft is assigned a discrete transponder code for radar purposes. This allows FAA air traffic controllers to monitor the progress of the flight on radar and to provide air traffic advisories to pilots via radio.

Shortly before 2:52 p.m., Palomo's aircraft entered an area monitored by Jim Miller, an FAA air traffic controller with 17 years of experience at the Houston Air Route Traffic Control Center, located in Houston, Texas. At 2:52:27 p.m., Palomo checked in with the Houston Control Center on his radio and stated his altitude. Miller gave Palomo the current altimeter setting, which Palomo

---

[3]According to Swan, Palomo had accumulated about 100 hours of flight time in the Bonanza prior to July 5, 1994.

acknowledged. About two minutes later, after Miller handled a number of other planes in the Houston Control Center airspace, Miller contacted Palomo and told him that Houston radar showed his aircraft to be at 12,500 feet altitude, rather than his reported altitude.[4] In response, at 2:55:25 p.m., Palomo confirmed his altitude reading and then said, "I'm uh beginning to get into some clouds here - - um could you steer me in the (unintelligible). I've got a believe I got a thunderstorm to my right." Miller asked, "[A]re you uh capable of or qualified for IFR flight?"[5] Palomo responded, "Negative."

Miller suggested that Palomo head in a direction that "should break [him] out in the clear" within two and one-half minutes. He also told Palomo that after he broke out into the clear to take a heading that would keep his aircraft parallel with the weather front. After Miller gave this advice, two other aircraft and the Pensacola Control Center engaged him in radio transmissions for about 30 seconds. Miller then tried to contact Palomo to confirm his receipt of Miller's suggested heading. After 14 seconds passed with no response, Miller tried again. Palomo responded, "Go ahead." Miller said, "Okay sir, uh, did you read my last transmission? Did you understand it?" Palomo said, "Uh, go ahead and give me again please." Miller said, "Okay sir. Did you understand the suggested heading of uh zero eight zero to take you out of the weather?" There was no response from Palomo until 20 seconds later at 2:58:19 p.m. when he twice shouted, "Mayday, Mayday, we're going down."

Miller immediately declared an emergency on the radio. Two other pilots soon reported receiving an emergency locator signal, indicating that a plane had crashed. The wreckage of the

---

[4]Both parties agree that the altitude discrepancy had no connection to the crash.

[5]"IFR" refers to instrument flight rules. A pilot capable of IFR flight has been trained to fly by instruments alone.

Bonanza and Palomo and Plunkett's bodies were found in a wooded area near Jackson, Alabama.

Palomo's wife, three children, and Auto Center, Inc., the owner of the aircraft, along with Plunkett's son and his estate filed administrative claims for money damages against the FAA alleging negligence on the part of Miller for failing to help Palomo avoid flying into an area of disturbed weather. The FAA denied these claims. In May 1996, the Palomo plaintiffs filed suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346, alleging that the FAA and its air traffic controllers violated their duty to advise Palomo about weather conditions and guide him away from adverse weather. In January 1997, the Plunkett plaintiffs filed a similar claim. The two cases were consolidated before trial.

The plaintiffs had alleged in their complaint that Mississippi wrongful death law afforded them a cause of action based on the defendant's negligence. The United States filed a motion seeking an order that the substantive law of Texas controlled the issues of liability in the case. Before trial, the court determined that Mississippi law would apply to any negligence issues in the case.

A bench trial was held August 17-19, 1998. The court issued its judgment on May 31, 2000. The court found that Palomo had operated the plane carelessly or recklessly and violated federal aviation regulations by flying into clouds even though he was not certified to fly by instruments alone. Applying Texas negligence law, the court concluded that the accident was caused by Palomo's negligence in flying into weather conditions he was not trained to handle. The court found no negligence in the traffic controller's actions because the controller was not aware of the severity of the weather conditions or of the extent of the pilot's predicament.

The plaintiffs filed a motion for reconsideration, which the court granted in part and denied in part on January 31, 2001. The court admitted error in applying Texas, rather than Mississippi,

5

negligence law in the case. However, the court found that Texas negligence law was essentially the same as Mississippi and that the error in using Texas law was harmless. The court denied the motion for a new trial on the merits and reaffirmed that the pilot alone was negligent.

The plaintiffs have appealed arguing that the district court erroneously applied Texas law in evaluating negligence and erred in not finding the air traffic controller at fault.

## ANALYSIS

Findings of fact, in actions tried without a jury, shall not be set aide unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.[6] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.[7] We review claims of legal error de novo.[8]

Under the Federal Tort Claims Act, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his employment under circumstances where a private person could be held responsible to the plaintiff in accordance with the law of the place where the act or omission occurred.[9] Thus, state law principles of negligence control cases under this act. In addition, federal

---

[6] *See* Fed. R. Civ. P. 52(a).

[7] *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985).

[8] *In re Air Crash at Dallas/Fort Worth Airport*, 919 F.2d 1079, 1086 (5th Cir. 1991).

[9] 28 U.S.C. § 1346(b).

regulations can impose duties and standards of conduct on federal employees.[10] In air travel, the government's duty to airline pilots may rest upon the requirements of air traffic controllers' procedure manuals or upon general pilot reliance on the government for a given service. [11] "That duty, in appropriate circumstances, requires due care in providing both current weather information and weather forecasts."[12] An air traffic controller's duty to exercise reasonable care also applies to passengers.[13]

According to the Air Traffic Controller's Manual, the first priority of an air traffic controller is the separation of aircraft.[14] Providing additional services, such as weather information, is secondary, and the controller decides whether other duties permit performance of that service.[15] When dealing with emergencies, air traffic controllers should obtain enough information to handle the emergency intelligently and provide maximum assistance.[16] An aircraft is in distress if it is being threatened by serious and/or imminent danger and requires immediate assistance.[17] A pilot who encounters a distress situation should declare an emergency by stating "Mayday."[18] If the word

---

[10]*Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970).

[11]*Id.*

[12]*Id.* (citations omitted).

[13]*Ross v. United States*, 640 F.2d 511, 519 (5th Cir. Unit B Jan. 1981).

[14]FAA, *Air Traffic Control Manual*, 7110.65H § 2-2(a) (1994).

[15]*Id.*

[16]*Id.* §§10-2, 10-3.

[17]*Id.* Glossary, D-2

[18]*Id.* §10-1(b).

"Mayday" is not used and the controller is in doubt that a situation constitutes an emergency, the controller should handle the situation as though it were an emergency.[19] When a VFR aircraft requests radar assistance after it encounters IFR weather conditions, an air traffic controller should avoid abrupt maneuvers and vector the aircraft to VFR conditions.[20]

While air traffic controllers must use reasonable care, pilots are directly responsible for the safety of their passengers and are the final authority for the operation of their planes.[21] This court has observed that it is a "wholly unsafe practice for a non-instrument rated pilot to approach and penetrate any cloud formation" because of the hazard of pilot disorientation.[22] Regulations require a VFR pilot to avoid all clouds by at least 2,000 feet horizontally and to maintain flight visibility for at least three miles.[23] The risk of flying into clouds associated with a thunderstorm is that the turbulence associated with such weather will exceed the structural limits of an aircraft.[24]

Plaintiffs assert that Miller, the air traffic controller, failed to comply with the standard of care set forth in the Air Traffic Control Manual by not obtaining enough information to handle the emergency intelligently. According to plaintiffs, Palomo's statements to Miller that he was "beginning to get into some clouds" and believed there was a thunderstorm to his right were

---

[19]*Id.* §10-1(c).

[20]*Id.* §§10-17, 10-18.

[21]*Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278, 285 (5th Cir. 1987).

[22]*Black v. United States*, 441 F.2d 741, 744 (5th Cir. 1971).

[23]14 C.F.R. § 91.155.

[24]*McKinney v. Air Venture Corp.*, 578 S.W.2d 849, 853 (Tex.App. - Fort Worth 1979).

8

ambiguous and that Miller should have inquired further about Palomo's flight conditions. Because Miller assumed that Palomo was in IFR conditions, plaintiffs contend, Miller allowed Palomo to continue heading into an area of thunderstorms that Miller could see on his radar scope. Plaintiffs claim that Miller's assigning of the 080 heading without first ascertaining Palomo's flight conditions was a failure to exercise reasonable prudence. The plaintiffs also allege that Miller failed to receive acknowledgment from Palomo that he had received Miller's suggested heading, in violation of the Air Traffic Controller's Manual.

The district court found that Palomo knew that thunderstorms were forecast along his proposed route. When Palomo checked in with Houston Air Route Traffic Control Center, his aircraft was heading southeast on a flight path free of precipitation, but parallel to areas of precipitation. Other aircraft had indicated to Miller that the weather displayed on his radar scope was "not that bad" and could be avoided. The court also found credible the testimony of a government expert that Palomo flew into a cloud build up that could be seen from 25 miles distance during the last 40 to 50 miles of the flight. Palomo did not declare an emergency until his final transmission of "Mayday, Mayday, we're going down." The court found that Palomo did not seek help from Miller until he was already in the clouds or had lost VFR conditions. Finally, the court found that Palomo's failure to follow Miller's suggested heading out of the weather resulted in his becoming disoriented. Palomo's aircraft then encountered aerodynamic forces beyond its structural limits, causing its in-flight breakup.

We conclude that the district court was not clearly erroneous in finding that Miller did not breach his duty of reasonable care to Palomo, but fulfilled his obligations to Palomo by offering him

9

a suggested heading out of the clouds; that Miller did not have a duty to question Palomo further about the flight conditions that Palomo reported to him; that Miller followed the guidelines of the Air Traffic Controller's Manual by avoiding any abrupt maneuvers and giving Palomo a heading that would take him into VFR conditions as quickly as possible; and that Miller could not have detected that the weather conditions were more severe than Palomo reported and could not have foreseen that Palomo would not heed his advice.  We see no clear error in the district court's determination that the accident was caused by Palomo's negligence in flying into clouds, failing to request assistance before entering hazardous weather conditions, ignoring Miller's instructions, and failing to timely declare an emergency; and that the accident was not caused by any negligent act or omission on the part of the air traffic controller.

Because we find no clear error in the district court's determination that the air traffic controller was not guilty of any actionable negligence, under either Texas or Mississippi law, we need not address whether the trial court erred in its choice of law decision.

For the foregoing reasons, the judgment of the district court is AFFIRMED.