664 F.2d 830
 FEDERAL EXPRESS CORPORATION, et al., Plaintiffs, Appellants,
v.
STATE OF RHODE ISLAND, DEPARTMENT OF TRANSPORTATION,
AIRPORTS DIVISION, et al., Defendants, Appellees.
FEDERAL EXPRESS CORPORATION, et al., Plaintiffs, Appellees,
v.
STATE OF RHODE ISLAND, DEPARTMENT OF TRANSPORTATION,
AIRPORTS DIVISION, Defendant, Appellant,
and
The United States of America, Defendant, Appellee.
 Nos. 81-1033, 81-1058.
 United States Court of Appeals,
First Circuit.
 Argued June 5, 1981.
Decided Sept. 28, 1981.
 
 James J. Sentner, Jr., New York City, with whom Joseph E. Rendini, Haight, Gardner, Poor & Havens, New York City, James V. Aukerman, and Kenyon & Aukerman, Wakefield, R. I., were on brief, for Federal Express Corp. and United States Aviation Underwriters, Inc.
 Daniel J. Schatz, Sp. Asst. Atty. Gen., Providence, R. I., with whom Dennis J. Roberts, II, Atty. Gen., Providence, R. I., was on brief, for the State of Rhode Island.
 Kathlynn G. Fadely, Trial Atty., Civ. Div., Torts Branch, U. S. Dept. of Justice, Washington, D.C., with whom Paul F. Murray, U. S. Atty., Providence, R. I., and Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D.C., were on brief, for the United States of America.
 Before COFFIN, Chief Judge, ALDRICH and BREYER, Circuit Judges.
 BREYER, Circuit Judge.
 
 
 1
 At about two o'clock in the morning on September 27, 1975, at Theodore F. Green State Airport outside Providence, Rhode Island, a Dassault Falcon 20-D jet aircraft mistakenly attempted to take off on an illuminated but inactive runway on which four aircraft had been parked. The ensuing collision happily caused no loss of life, but it did produce substantial property damage, including the destruction of the Falcon jet. Federal Express Corporation, the owner of the Falcon, subsequently brought the present action against both the United States and the State of Rhode Island, alleging negligence by the former in its provision of air traffic control services and by the latter in its operation of the airport. At the end of a six-day trial, the district judge, sitting without a jury, issued a decision from the bench in which he found that plaintiff's negligence constituted the sole proximate cause of the accident-a determination from which plaintiff now appeals. The state of Rhode Island lodges a separate appeal from an earlier ruling, issued in response to a motion to dismiss, that R.I.G.L. § 9-31-1 (1969) effected a general waiver of the state's eleventh amendment immunity from suit in federal court in tort cases. We affirm the district court's determination that neither defendant is liable.
 
 I.
 
 2
 The flight of the Falcon, with a crew consisting of Captain John Soltow and First Officer Jack Miller, originated at plaintiff's home base in Memphis, Tennessee. Following a twelve-hour layover in Hartford, Connecticut, the aircraft departed for Bedford, Massachusetts with Boston's Logan Airport listed as an alternative. But bad weather intervened, and the Falcon was diverted to Green Airport-a location to which Federal Express did not customarily fly. Since neither crew member was familiar with the airport, Captain Soltow consulted a Jeppesen Navigation and Airport Chart prior to landing, which contained pertinent information and a diagram depicting the airport configuration. (The airport diagram is attached as an appendix to this opinion.) Approaching from the southwest, the Falcon received clearance, and at approximately 11:00 p. m. it landed at runway 5R, the reciprocal of 23L. As the diagram indicates, runway 23L/5R (hereinafter "23L") is the longest runway at Green Airport, running parallel to, and to the east of, runway 23R/5L (hereinafter "23R").
 
 
 3
 Confusion arose shortly after the Falcon's touchdown. Captain Soltow stopped the aircraft at the intersection with runway 16/34 and asked the controller for directions to a refueling location. The controller, intending that the Falcon park on the north ramp between the head of 16/34 and that of 23R, offered Soltow a choice of routes: either taxiing to the end of 16/34 and turning right or making an earlier right turn onto 23R and entering the ramp area from the opposite direction. The Captain in fact followed the first option; he proceeded to the end of runway 16/34, turned right and parked the Falcon-at the correct location-on the ramp's edge. But both crew members, apparently confused due to a circular turn mistakenly executed by Soltow, believed they had chosen the second option. Thus, when Soltow and Miller stepped off the parked Falcon to await the arrival of cargo, they believed it was positioned between 23R and 23L when in fact it was between 23R and 16/34. During their three-hour sojourn, neither crew member sought to verify this belief.
 
 
 4
 Some three and one-half hours before the Falcon's arrival, and in accordance with long-established practice, runway 23R was temporarily closed for all takeoffs and landings so that diverted aircraft could be parked and serviced. Shortly thereafter, four aircraft were parked on the lower half of 23R, immediately south of the intersection with taxiway 9. The runway was kept illuminated, the defendants explained, to facilitate parking of the aircraft and because the northern half remained in use as a taxiway. Notice of the runway closing was disseminated through customary channels: the airport operator issued a report by telewriter to the controller, who in turn transmitted a Notice to Airmen (NOTAM) to Boston Flight Service. The controller also included the NOTAM in the Providence Automatic Terminal Information Service (ATIS), a continuous radio broadcast of recorded information concerning weather and airport conditions. Over Captain Soltow's denial, the district court found that the crew had learned of 23R's closing prior to their attempted departure.[1] In any event, 23R was permanently closed to aircraft weighing over 12,500 pounds, such as the Falcon-a restriction which was noted on the Jeppesen chart and of which the crew was indisputably aware.
 
 
 5
 At 1:57 a.m., with the cargo loaded and a third Federal Express employee aboard as a passenger, Soltow and Miller were ready for the return flight to Memphis. They initially requested runway 5R for departure but changed their request to 23L upon learning the wind speed and direction from Warren Prosser, who started work at midnight as the sole controller on duty. After granting this request, Prosser engaged in the following exchange with the crew:
 
 
 6
 Tower: All right, taxi through the Guard ramp with caution.
 
 
 7
 Falcon: Okay and that would be a right turn the way we're faced and straight down?
 
 
 8
 Tower: What are you facing, the buildings on the ramp?
 
 
 9
 Falcon: Yes sir.
 
 
 10
 Tower: That's correct, it would be a right turn.
 
 
 11
 Falcon: Okay.
 
 
 12
 Prosser's statement concerning the "Guard ramp" referred to the National Guard facility located on the north ramp between runways 23R and 23L. Repaving and construction work at the airport had necessitated the temporary installation of a taxi route through the National Guard area to afford access to the head of 23L. Because of the Guard aircraft normally parked immediately below this ramp, William McCarthy, chief of the Providence tower, had instructed his personnel to advise aircraft "to use extreme caution while taxiing via this route."
 
 
 13
 Six minutes later, Prosser cleared the Falcon to taxi to 23L and "hold for departure release."[2] At that time, Prosser harbored an accurate belief as to the aircraft's location.[3] The crew, having reexamined the Jeppesen chart but still mistaken as to their position, taxied along the north ramp until they reached an illuminated runway, which they assumed to be 23L. They then turned left, travelled to the head of the runway-which was in fact 23R-and reversed direction. Although the Falcon never traversed the Guard ramp (which was located between 23R and 23L), both crew members explained that they had understood Prosser as speaking of a "guarded ramp," which they had interpreted as a reference to construction barricades located to the west of 23R. The crew sat at the head of 23R for approximately thirty seconds. Although the visibility in light rain was then three miles, and despite their vantage point some nine to twelve feet above the ground,[4] Soltow and Miller failed to observe the four aircraft parked on the runway.[5] They failed to observe three flashing colored lights, each approximately eight inches in diameter and two feet off the ground, which had been placed across 23R immediately north of the diverted aircraft.[6] They failed to observe an illuminated runway-identification sign, reading "23R," located on the northwestern edge of the runway. And they failed to observe unobscured, sixty-foot-long numerals and letters, also reading "23R," painted in white on the runway pavement.[7]
 
 
 14
 At approximately 2:06 a.m., Prosser cleared the Falcon for takeoff.[8] At that time, the aircraft was displaying a white taxi light similar to an automobile headlight on its nose gear strut, a rotating red beacon on its roof, and both white strobe lights and standard red and green lights on its wingtips. The view from the tower, located just north of the main terminal, to the head of 23R was unobstructed. Prosser, since his initial contact with the Falcon nine minutes earlier, had been communicating with only one other, parked aircraft; the Falcon had been the sole aircraft moving on the airport. Nonetheless, Prosser did not monitor the aircraft's taxiing and, at the time when takeoff clearance was granted, he did not hold an accurate belief as to where the plane was located. The Falcon of course never took off. After attaining a speed of 110 knots, the crew spotted the planes at the same time that Prosser, apparently looking out the window for the first time, instructed them to abort. The crew tried to veer right, but the Falcon struck an Allegheny DC-9 with its left wingtip, collided with a service vehicle which exploded in flames, struck an American Boeing 727, and then shuddered to a halt perpendicular to the runway near its southern edge. The DC-9 and 727 sustained substantial damage; the service vehicle and the Falcon were destroyed.
 
 II.
 
 15
 The plaintiff alleged numerous acts of negligence on the part of both Prosser and the state airport personnel. The challenged actions of the former, all said to violate the FAA's Air Traffic Control Manual, fall into four groupings: (1) his failure to determine the Falcon's location prior to issuing taxi and takeoff clearance; (2) his use of "local terminology" in advising caution through the National Guard ramp; (3) his failure visually to scan 23L for obstructions before clearing the Falcon for takeoff; and (4) his failure to inform the crew that construction activity was in progress near 23R, that cargo planes (C-130's) were parked adjacent to the Guard ramp, that 23R was illuminated, and that a guidance sign for 23L was not. Four separate categories of negligence, allegedly violative of either the state's Airport Operations Manual or federal regulations, were also charged against the state: (1) failure to barricade or properly mark runway 23R upon its temporary closing; (2) failure to extinguish 23R's runway lights at that time; (3) use of an inoperative guidance sign for 23L; and (4) failure to issue NOTAM's about the construction activity and the parked C-130's.[9]
 
 
 16
 The district court in its decision detailed the numerous acts of negligence which it found Soltow and Miller to have committed. The crew's repeated lack of care, adverted to above and fully supported by the evidence, is not disputed on appeal and need not be elaborated upon here. Since Rhode Island, whose law governs, is a "pure" comparative negligence state, plaintiff's negligence would not bar recovery for any negligence on the part of the defendants.[10] Of the eight general allegations of negligence against the two defendants, the court addressed only one individually. It considered the claim that Prosser had not taken adequate steps to verify the position of the aircraft before granting takeoff clearance. It held that, under the circumstances, Prosser acted reasonably. It was not negligent of him to fail to observe the Falcon visually and fail otherwise to verify its location prior to issuing taxi or takeoff clearance: "(T)he tower operator had the right to assume that, having given clearance to the proper runway, that is where the aircraft would have been located in the absence of any inquiry from the crew of the plaintiff's aircraft." The court rejected all other allegations on the ground that, "assuming them to be negligence, (they) were not the proximate cause" of the damage which occurred in this instance.[11] The crew's negligence, the court concluded, "was the sole proximate cause of the damage which occurred." We find the evidence sufficient to support both of these principal findings.
 
 III.
 
 17
 This action, arising under the Federal Tort Claims Act, is governed by the substantive law of Rhode Island. See 28 U.S.C. §§ 1346(b), 2674 (1970). In accordance with familiar principles of tort law, plaintiff must establish that the defendants owed a duty of care to the Falcon crew, that the defendants breached this duty, and that such breach was a proximate cause of plaintiff's injuries. See, e. g., Montuori v. Narragansett Elec. Co., 418 A.2d 5, 9-10 (R.I.1980). The standards of conduct to which the defendants are held in the present case are defined largely by operations manuals promulgated by the government.[12] Although slight deviations from manual procedures do not necessarily constitute negligence, e. g., Delta Air Lines, Inc. v. United States, 561 F.2d 381, 389-90 (1st Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); Baker v. United States, 417 F.Supp. 471, 485 (W.D.Wash.1975), we have previously indicated that "a substantial and unjustified failure to follow procedures made mandatory by the Manual is persuasive as an indication of a lack of due care." Delta Air Lines, Inc. v. United States, 561 F.2d at 390. The Rhode Island courts have embraced a similar position, holding that in an action based on violation of a statute or ordinance, "evidence of injury proximately caused by the violation is prima facie evidence of defendant's liability and entitles the plaintiff to recover, unless rebutted by evidence in favor of the defendant." Sitko v. Jastrzebski, 27 A.2d 178, 179 (R.I. 1942); accord, Rossi v. Ronci, 7 A.2d 773, 775 (R.I.1939). The existence and extent of a duty of care are questions of law; whether any such duty has been breached and whether proximate cause exists are questions for the factfinder, whose determination is binding on appeal unless clearly erroneous.[13] E. g., Rudelson v. United States, 602 F.2d 1326, 1329 (9th Cir. 1979); Miller v. United States, 587 F.2d 991, 994-95 (9th Cir. 1978); Delta Air Lines, Inc. v. United States, 561 F.2d at 394; Peycke v. United Elec. Rys. Co., 49 R.I. 257, 142 A. 232, 234 (1928).
 
 
 18
 Plaintiff's allegation that Prosser negligently failed to ascertain the Falcon's position centers upon two provisions in the FAA Air Traffic Control Manual-described by Prosser as the controllers' "bible." Section 260 instructs controllers generally to "(p)rovide airport traffic control service based only upon observed or known traffic and airport conditions." More specific directions are contained in § 386: "Determine the position of an aircraft prior to issuing taxi information or takeoff clearance when its position is in doubt or unknown to you." Both of these provisions are mandatory.[14] Also pertinent are two "notes" to § 386. The first states that "aircraft position may be determined visually by the controller, by pilot's report, or (by a mechanical device unavailable at Green Airport)." The second provides: "At an airport with parallel runways, you need to know which runway the aircraft is at for takeoff."[15]
 
 
 19
 We need not dwell on the contention that Prosser negligently failed to verify the Falcon's location prior to issuing taxi clearance. As noted above, his belief as to the aircraft's position at this time, although based more on assumption than fact, was accurate. See note 3 and accompanying text supra. It follows that any failure to confirm this belief by visual or other means was without consequence.
 
 
 20
 The issue is whether Prosser negligently failed to determine the position of the aircraft immediately prior to issuing takeoff clearance. The district court, as we interpret its opinion, held that Prosser was not negligent in failing to verify the aircraft's position visually at the end of the runway just before takeoff or to take other special steps to determine its location. Apparently, in its view, given the ordinary practices and expectations of flight controllers and pilots, it was not unreasonable of Prosser not to take any such special verification measures. We cannot say that the district court holding was clearly erroneous.
 
 
 21
 For one thing, we doubt that the word "unknown" in § 386 requires a controller always explicitly to reascertain the pilot's position at the head of the runway. If read literally, of course, the word would make the controller responsible for every positional mistake made by the pilot unless he reascertained the aircraft's position. Yet, to use the word "unknown" would be so roundabout a way of telling him to do so that it is difficult to believe that such is the regulation's intent.
 
 
 22
 In any event, in this case Prosser complied with the section, for he determined the aircraft's position by means of a "pilot report." At the time of takeoff clearance, Prosser asked the crew whether it was "ready for departure." He received the response: "Yes sir, we're ready to go." See note 8 supra. Since the crew had requested a clearance to runway 23L only a few moments earlier, this remark, in context, amounted to a representation by the crew that the aircraft was where it was supposed to be.[16] Walter Brown, an air traffic control expert presented by the United States, testified directly that reliance on such a "pilot report" was justified under the circumstances. And the contrary testimony provided by Soltow and echoed by Miller-that a controller must either visibly monitor an aircraft's movement or, where impossible or unfeasible, advise the crew of such fact-finds scant support in the Manual provisions and was, we think, properly discounted.
 
 
 23
 Of course, as plaintiff points out, there are circumstances here that might have called for additional care. For one thing, the Manual suggests that the existence of parallel runways requires the exercise of special caution on the part of a controller. And Prosser knew that the Falcon would have to taxi directly across the head of 23R, in light rain, at a time when the runway was fully illuminated and unbarricaded. At the same time, since possession of Jeppesen charts was mandatory and since the crew had just flown into the airport three hours earlier, Prosser reasonably could have assumed that the crew members were generally knowledgeable of the airport layout and specifically aware of the parallel runways. The configuration of Green Airport, of course, was relatively uncomplicated, and Prosser knew, based on his accurate belief as to the Falcon's parking location, that the intended taxi route followed a straight line. He also justifiably could have assumed, given the three-mile range of visibility, that the diverted aircraft and flashing markers on 23R would have been readily apparent had the crew glanced down that runway. These factors suggest that Prosser had little reason to suspect difficulty.
 
 
 24
 Plaintiff also argues that the crew's obvious lack of familiarity with Green Airport required that Prosser remain particularly attentive to the Falcon's movements. But even assuming that a pilot's apparent unfamiliarity with an airport can, on occasion, necessitate the exercise of heightened vigilance,[17] we see little in the present record that would have triggered any such duty. Prosser did admit that, to his knowledge, this was the first visit to the airport by a Federal Express aircraft-and thus inferably the crew's initial visit as well. Yet a controller clearly is under no duty to accord special attention to every aircraft or crew with which he is unfamiliar; in fact, plaintiff advances no such argument. Rather, any duty of heightened care can arise only in response to some objective manifestation of a crew's confusion or significant uncertainty about its surroundings. Here, there were only two actions remotely manifesting the crew's confusion. One of them was their request for confirmation of the direction to 23L, contained in their initial transmittal to Prosser. But this precaution in ensuring that they commenced taxiing in the right direction offered little suggestion that, once headed in that direction, the crew would require further assistance; indeed, their inquiry apparently only sought perfunctory confirmation of information already known to Soltow and Miller. The crew never asked Prosser for "progressive" taxi instructions-a request that the controller guide a pilot from point to point-notwithstanding that the chief flight instructor for Federal Express indicated that he expected his pilots to request progressives whenever they were unfamiliar with an airport. The only other manifestation of confusion was the crew's initial request, made several hours earlier, for progressive taxiing instructions to a refueling area. Since the crew ended up where the tower had directed it, there was little in this fact to alert the tower to crew confusion several hours later. The court explicitly found that there was "nothing in these circumstances which would have alerted the controller to any difficulty on the part of the crew in determining their location." Consequently, we think the court was justified in evaluating Prosser's conduct in accordance with normal standards of care.[18]
 
 
 25
 We also think, in light of these various factors, that the court did not clearly err in ruling that Prosser's reliance on the crew's expression of "readiness" was sufficient to satisfy the command of § 386. We are not saying that this type of pilot's report always constitutes adequate verification of position. We recognize that in the classic concurrent negligence case the negligence of one party may consist of failure to anticipate or appreciate the negligence of the other. We simply hold that here, where the pilot has a map of the airport, where the controller has correctly ascertained the aircraft's position prior to taxiing, where the controller provides the aircraft with correct taxiing instructions, where the pilot has announced he is proceeding to a specified runway, where the controller has no reason to believe anything has gone awry, and where the pilot subsequently announces that he is "ready", it is not clearly erroneous for the district court, acting as factfinder, to hold, after trial, that the controller need not do more, which is to say that the controller is not negligent.
 
 IV.
 
 26
 Federal Express of course had the burden of establishing "by competent proof" that its injury was causally connected to the defendants' negligence. Evans v. Liguori, 374 A.2d 774, 777 (R.I.1977). Under Rhode Island law, a plaintiff must demonstrate that the injury would not have occurred "but for" the defendant's negligent conduct. E. g., Allen v. State, 420 A.2d 70, 72 (R.I.1980); Salk v. Alpine Ski Shop, Inc., 115 R.I. 309, 342 A.2d 622, 626 (1975). Moreover, such negligence must be shown to have been a "direct," rather than a "remote," cause of the injury. E. g., Mullaney v. Goldman, 398 A.2d 1133, 1136 (R.I.1979); Kemplin v. H. W. Golden & Son, 52 R.I. 89, 157 A. 872, 872 (1931); Peycke v. United Elec. Rys. Co., 49 R.I. 257, 142 A. 232 at 234. Compare Restatement (Second) of Torts § 431 (negligent act must have been a "substantial factor" in bringing about the harm). As noted above, the district court dismissed the host of remaining allegations against the defendants on the ground that, even if the challenged actions were negligent, they were not a proximate cause of the collision. As we indicated above, "(t) he question of legal cause is for the factfinder; the issue involves essentially no legal judgments. Therefore, we must uphold the district court's finding unless it is clearly erroneous." Delta Air Lines, Inc. v. United States, 561 F.2d at 394. Our review of the record discloses no basis for disturbing the court's findings in this regard.
 
 
 27
 Plaintiff first challenges the fact that, apparently due to the nearby construction work, a runway guidance light located to the east of 23R and specifying the direction to 23L was inoperative. By permitting such a situation to exist, the state is said to have violated a federal requirement that all guidance signs be in "operable condition." See 14 C.F.R. § 139.47(b).[19] Prosser, who stated he had not known whether or not the light was operative, in turn is said to have violated § 305 of the Manual, which directs a controller "where appropriate" to issue "airport condition information" including any "(i)rregular operation of part or all of the airport lighting system." It is certainly possible that, had the guidance sign been lit and had the crew spotted it, the accident would have been averted. But in finding that this condition was not a "direct" cause of the collision, the court did not clearly err. The fact that the crew failed to observe the illuminated guidance sign reading "23R," bordering the western edge of the runway, suggests that a functional "23L" sign would have been similarly overlooked. Brown testified that such directional aids frequently are absent altogether from airports, even from those with parallel runways, and it is apparent that Soltow and Miller were not on the lookout for them. Moreover, "unless we resort to conjecture and speculation," Sitko v. Jastrzebski, 68 R.I. 207, 27 A.2d 178 at 179, we cannot say that, had the crew been notified of the inoperative sign, they necessarily would have exercised that degree of vigilance sufficient to uncover their mistake. The evidence of "cockpit confusion" prior to takeoff was more than adequate to render any such hypothetical inference less than compelling.
 
 
 28
 Plaintiff next calls into question Prosser's failure to advise the crew of, and the state's failure to issue NOTAM's concerning, both the construction work adjacent to 23R and the parked C-130 aircraft bordering the Guard ramp. Since the crew acknowledged having seen the construction while taxiing, any breach of care in this respect clearly was no proximate cause of the accident. We also think the court was justified in disregarding on this basis the breach of any duty to advise pilots of the C-130's.[20] We can only speculate whether the crew's failure to observe these aircraft, after having been warned of their presence, would have altered the crew's conduct. On the evidence presented, the court could well have inferred that Soltow and Miller were spending little time peering out the cockpit window. We also note that the obvious purpose of these directives is to prevent collisions between taxiing and parked aircraft, not to assist crews in ground navigation. That the injury here was not of the type-or at least did not occur in the manner-sought to be avoided by the regulations further militates against a finding of proximate cause.
 
 
 29
 The allegation regarding Prosser's "Guard ramp" comment was properly dismissed for similar reasons. Plaintiff cites to § 291 of the Manual, which instructs controllers to "(d)escribe the relative positions of traffic in an easy-to-understand manner, ... instead of by local terminology or compass directions." The court as much as admitted that "Guard ramp" was a local expression, stating that such an instruction "would have been clear to one who had local knowledge of the location of the National Guard facility."[21] Yet, again, what the crew's response would have been to a more explicit reference is conjectural. Soltow and Miller apparently would have understood a more direct reference, since a National Guard facility and ramp existed immediately adjacent to their home base in Memphis. But there was no suggestion that all "Guard ramps" share particular identifying characteristics which the crew might have expected to observe. The ramp at Green Airport, in fact, was only a makeshift arrangement implemented to accommodate the nearby construction. Furthermore, although they misinterpreted the "Guard ramp" reference, the crew members certainly comprehended that caution was being urged-yet they failed to exercise due care nonetheless. We think the court was warranted in finding that Prosser's somewhat oblique instruction was not a direct cause of the collision.
 
 
 30
 What remain[22] are allegations focusing upon the fact that runway 23R, while being used to park diverted aircraft, was fully illuminated. The principal attack against the state is based on § 8(c)(3) of the FAA's Advisory Circular No. 150/5340-1D,[23] which reads in part: "On runways or taxiways where the unserviceable area is such as to render the runway or taxiway or portion thereof unusable, ... disconnect controls to the runway or taxiway lights in the section rendered unusable."[24] Prosser in this context is again alleged to have violated § 305's requirement, mentioned above, that a controller report any "(i)rregular operation of part or all of the airport lighting system."[25] In the circumstances of this case, we cannot fault the court's finding that the state's instruction to the tower to keep 23R illuminated did not contribute directly to the accident. The state's witnesses explained that the runway lights were kept on in order to facilitate parking and servicing of the diverted aircraft and because the northern half of 23R remained in use as a taxiway. Plaintiff advances no challenge to the use of the upper portion of 23R for taxiing purposes and offered no evidence below that employment of runway lights to illuminate such a temporary taxiway was improper. Instead, it complains of the state's failure to extinguish the lights along the southern half of the runway. But Soltow and Miller both testified that they had no view beyond the midpoint of that runway. Whether or not a "hump" blocked their view, see note 6 supra, the crew acknowledged having failed to observe the lower half of the runway. In light of this admission, it was reasonable of the court to absolve the state of all liability.[26]
 
 
 31
 We similarly cannot say that the comparable finding with respect to Prosser's failure to advise the crew that 23R was illuminated rises to the level of clear error. Of course, Soltow and Miller were under the belief that they would not be taxiing across 23R. A warning pertaining specifically to that runway, therefore, might have caused them to wonder, and perhaps to ascertain, why such a message was being conveyed. Moreover, once apprised that both parallel runways were lit, the crew members might have been less inclined blithely to assume that the first one they reached would be 23L. Again, however, the evidence of the crew's egregious and repeated lack of due care offers scant assurance that any such response to a notice of 23R's lighting would have eventuated. They did not, after all, notice runway 23L's lights although it was fully illuminated. In any case, since such a notice presumably would have been issued before the Falcon had commenced taxiing, they might equally well have assumed that the (supposed) proximity of their parking location to 23R had prompted the remark. It is of course impossible to predict with any confidence what the crew's reaction would have been. And precisely for this reason, we decline to disturb the court's finding on this issue.
 
 
 32
 Affirmed.
 
 
 33
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 Under Federal Express operating procedures, the crew was required to monitor the ATIS broadcast before arriving at and departing from Green Airport and also to obtain all pertinent NOTAM's prior to departure. Officer Miller testified that he had monitored the Providence ATIS before the attempted takeoff, and an employee at the Boston Flight Service stated that he had received a call from, and had reported pertinent NOTAM information to, one of the crew members at 1:41 a.m. on September 27-some twenty-five minutes before the collision
 
 
 [2]
 The exchange was as follows:
 Falcon: And tower Express seventy-one twenty-seven ready to taxi, going to two three left.
 Tower: Taxi into position and hold for departure release.
 Falcon: Okay.
 
 
 [3]
 In his deposition, Prosser did acknowledge a lack of certainty concerning the aircraft's location at the time taxi clearance was issued. It should also be noted that the dialogue quoted in the text above disclosed the direction in which the Falcon was pointed but failed to pinpoint its location on the north ramp, since several buildings bordered the northern edge of the ramp. Nonetheless, Prosser explained that not only had he assumed that the aircraft was positioned between 23R and 16/34-the customary parking area for this type of aircraft-but he had "thought (he had seen) lights over there."
 
 
 [4]
 Captain Soltow "guessed" that the bottom of the Falcon's window was seven and one-half feet off the ground, but John Wright, the FAA's Chief of Flight Standards in Memphis, testified that a pilot would be eleven to twelve feet above the runway at eye level. The district court made no finding on this point
 
 
 [5]
 Conflicting evidence was presented as to whether the northern-most of the diverted aircraft had lights showing at this time. Although the district court failed to resolve this question, it did find that "the crew should have been able to observe the aircraft on the runway ahead of them."
 
 
 [6]
 In an attempt to explain their failure to see the aircraft and flashing lights prior to takeoff, Soltow and Miller stated that a "hump" halfway down 23R blocked all view of the southern half of the runway. This assertion was refuted by topographical evidence-disclosing no more than a two and one-half foot change in grade over the length of the runway-and was rejected by the district court. See note 5 supra
 
 
 [7]
 The district court also mentioned the crew's failure to see the runway lights of 23L, which were of higher intensity than those of 23R-a fact known to the crew-and which were illuminated throughout this period. However, the court apparently was referring to a point in time after the Falcon had commenced its takeoff roll. It stated: "There is no evidence which suggests that the lights on Runway 23L were visible to the crew. However, it seems to me that at some point those runway lights should have been visible to the crew...."
 
 
 [8]
 The exchange, initiated by Prosser, was as follows:
 Tower: Express seventy-one twenty-seven ready for departure now?
 Falcon: Yes sir we're ready to go.
 Tower: Okay, on course, cleared for takeoff.
 Falcon: Roger, on course, cleared, seventy-one twenty-seven.
 The "on course" language pertained to the aircraft's directional heading following liftoff.
 
 
 [9]
 The plaintiff also contended below that improper drainage on 23R had obscured the runway numerals, but it does not challenge on appeal the district court's contrary finding
 
 
 [10]
 See R.I.G.L. § 9-20-4 (1980)
 
 
 [11]
 The United States suggested at oral argument that the district court's finding of no proximate cause encompassed the allegation concerning Prosser's failure to ascertain the Falcon's position. We read the court's decision otherwise; immediately after concluding that Prosser exercised due care in determining the aircraft's location, the court turned to the proximate cause issue to dispose of "the other deficiencies suggested by the plaintiff." (emphasis added.) If Prosser had noticed that the plane was at the head of runway 23R prior to takeoff, it is difficult to see how any accident could have occurred. We address the issue of proximate cause in greater detail below
 
 
 [12]
 A controller or airport operator, of course, also may be obligated in appropriate circumstances to perform tasks beyond those prescribed in the manuals. E. g., Rudelson v. United States, 602 F.2d 1326, 1329 (9th Cir. 1979); Spaulding v. United States, 455 F.2d 222, 226 (9th Cir. 1972); American Airlines, Inc. v. United States, 418 F.2d 180, 193 (5th Cir. 1969); Hartz v. United States, 387 F.2d 870, 873 (5th Cir. 1968)
 
 
 [13]
 "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)
 
 
 [14]
 An earlier section of the Manual states that action verbs in the imperative mean that a procedure is mandatory
 
 
 [15]
 This same note also states: "An aircraft calls for taxi information for takeoff: you need to know where he is on the hanger line or gate area."
 
 
 [16]
 Plaintiff contends that Prosser never testified to having relied on the crew's expression of readiness in order to establish their location. The fact remains that he never denied having done so either. We think the court reasonably inferred that such reliance existed
 
 
 [17]
 See, e. g., Harris v. United States, 333 F.Supp. 870, 873 (N.D.Tex.1971). Cf. Rudelson v. United States, 602 F.2d at 1329 (duty of care owed by controller must be tailored to aircraft's special circumstances); Freeman v. United States, 509 F.2d 626, 629 (6th Cir. 1975) (same)
 
 
 [18]
 The United States emphasizes the number of other tasks Prosser was performing during this period. However, Prosser acknowledged that he was not unusually busy, and there was no evidence of any "higher priority concern" that might have justified a deviation from normal standards of care toward the Falcon. See Delta Airlines, Inc. v. United States, 561 F.2d at 390, 392-93. Indeed, we note that Prosser was the one to initiate the takeoff-clearance dialogue, see note 8 supra, presumably at his convenience
 
 
 [19]
 This provision, one of the many federal regulations contained in 14 C.F.R. Part 139 which govern airports serving commercial air carriers, reads: "The applicant (for an airport operating certificate) must show that any guidance signs installed on its airport are in operable condition."
 
 
 [20]
 The allegation against the state rests on 14 C.F.R. § 139.69, which requires an airport to have "appropriate procedures for ... disseminating information to air carrier users ... by Notices to Airmen or other means" concerning such conditions as the "presence of parked aircraft or other objects on, or next to, runways or taxiways." Prosser in turn is said to have violated two provisions of the Manual: § 305, mentioned above, which lists "(p)arked aircraft on the movement area" among the airport conditions to be reported; and § 290, which directs controllers to "(d)escribe vehicles, equipment, or personnel on or near the movement area in a manner which will assist pilots in recognizing them."
 
 
 [21]
 At the same time, it is questionable whether this cautionary instruction pertained to "the relative positions of traffic" within the meaning of § 291. Nonetheless, we shall assume that the use of this term was negligent
 
 
 [22]
 Plaintiff does advance several additional allegations, but these need not be discussed at any length. Section 262 of the Manual, which requires that a controller "(i)nsure that the runway to be used is clear of all known ground vehicles, equipment and personnel prior to the time a departing aircraft commences takeoff roll ...," is plainly inapplicable; no such obstructions were "known" to be present on 23L during this period. The state is said to have violated a provision in an advisory circular requiring that "temporarily closed" runways be marked with "crosses above the runway numerals." But the court justifiably found that, since its northern half remained open as a taxiway, 23R was not "closed" for the purposes of this regulation. Finally, plaintiff's assertion that no marker lights had been placed in front of the diverted aircraft was properly rejected on factual grounds
 
 
 [23]
 Contrary to plaintiff's assertion, AC 150/5340-1D is not listed among those advisory circulars the "technical guidelines" of which have been designated as "mandatory standards." See 14 C.F.R. § 151.72 & app. I. Nonetheless, we again shall assume negligence for the purposes of this appeal
 
 
 [24]
 Plaintiff also relies on 14 C.F.R. § 139.47(a), which provides in pertinent part: "The applicant for an airport operating certificate must show that any items of runway, taxiway, and threshold lighting ... are in operable condition.... An airport lighting item is considered inoperable if, during periods of use, it ... creates a lighting effect that misleads or confuses the user." Section 310.2(a)(1) of the Airport Operations Manual, also cited by plaintiff, pertains only to energy conservation
 
 
 [25]
 Section 462 of the Manual, to which plaintiff also makes reference, strikes us as irrelevant
 
 
 [26]
 The state has appealed the district court's decision that the state had waived its Eleventh Amendment immunity. The issue is difficult, see generally Marrapese v. Rhode Island, 500 F.Supp. 1207, 1212-24 (D.R.I.1980); Florida Dep't of Health & Rehab. Services v. Florida Nursing Home Ass'n, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam), and, in light of the plainly correct district court finding of "no causality", our decision of the issue could not change the result. In the interests of efficiency, we choose not to rule upon this question, recognizing that this decision is neither res judicata as to this point nor does it set a precedent should the issue arise again