**Dorothy M. LAUDERDALE, as Administratrix of the Estate of Donald L. Lauderdale, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 86–T–577–N.

United States District Court,
M.D. Alabama, N.D.

Feb. 26, 1987.

---

J. Greg Allen, Beasley and Wilson, Montgomery, Ala., for plaintiff.

John C. Bell, U.S. Atty., and Charles R. Niven, Asst. U.S. Atty., Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Dorothy M. Lauderdale, administratrix of the estate of her deceased husband Donald L. Lauderdale, has brought this action against defendant United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680. She claims that the federal government is responsible for the death of her husband due to substandard treatment he received at a medical facility at a military base in Montgomery, Alabama.

Based upon the evidence presented at a nonjury trial, the court concludes that the treatment given Mr. Lauderdale at the military medical facility was negligent and caused his death and that therefore Mrs. Lauderdale should recover appropriate damages from the United States.

### I.

During August of 1984, Mr. Lauderdale, a 51–year-old retired staff sergeant, began experiencing shortness of breath during his normal activity. After going to bed at night, he experienced a wheezing in his lungs, which would be relieved only if he got up during the night and went back to sleep in a sitting position in a chair.

Lauderdale first sought medical help for his problem on August 7, 1984, when he visited the hospital emergency room at Maxwell Air Force base in Montgomery. The doctor who examined Lauderdale that evening prescribed an antibiotic and told him he suspected a mild infection or flu. Lauderdale's problems continued during the next month, and he returned to the emergency room on September 10 for a reevaluation. He complained to the examining physician that his lungs were congested and that he had been unable to sleep, unless sitting up, for the preceding four or five days. Also, he said he felt shortness of breath with normal activity. The physician noted that he could detect fluid in both of Lauderdale's lungs, which he suspected was caused by a virus. He ordered lab work and an x-ray, which were subsequently performed. The doctor who completed Lauderdale's medical chart referred him to the family practice clinic at Maxwell for an appointment the following day.

On September 11, Lauderdale was examined by a family practitioner at the clinic. Again, Lauderdale complained of shortness of breath and inability to sleep unless sitting up. In addition, the physician noted that Lauderdale suffered chills, night sweats, and wheezing. Following the examination, the physician tentatively diagnosed Lauderdale's condition as either "walking pneumonia," which is a mild form of pneumonia, or tuberculosis. The physician performed tests to determine if either of these conditions was present, but the results were inconclusive. Lauderdale was treated with antibiotics for a pulmonary infection on an out-patient basis, with directions to return in three days.

Although Lauderdale could not obtain an appointment for a three-day follow-up visit, he returned to the clinic on September 14, on a walk-in basis. The same family physician who examined him on September 11 saw him on the 14th. Lauderdale told the doctor he was feeling better and that he had slept all night the night before.

The treating physician reported that, after examining Lauderdale, he was still uncertain of his diagnosis but that he suspected a form of pneumonia or bronchitis. At trial the physician testified that "something

didn't fit" about his diagnosis, accounting for his uncertainty; he said that, while Lauderdale's symptoms were consistent with pneumonia, the test results indicated that it would have to be an atypical strain of pneumonia for that to be the answer. The physician continued Lauderdale on antibiotics as treatment for pneumonia and told him to return the next week for a follow-up exam.

Lauderdale returned to the family practice clinic 11 days later, on September 25. He complained of "nocturnal wheezing," but when the treating physician listened to Lauderdale's lungs, he could not detect a wheezing sound. The doctor noted that Lauderdale's weight had increased by six pounds and that there was swelling in his feet and ankles. For the first time, the doctor noted an unusual heart sound. The doctor put together the weight gain, swelling, unusual heart beat, and troubled sleeping pattern, and began to suspect that Lauderdale was in the early stages of congestive heart failure.

In making his determination as to what treatment to prescribe, the treating physician considered it significant that Lauderdale was a chronic smoker, and that the heart sound he heard was consistent with a weakening of the heart muscle. Smokers of Lauderdale's age and sex typically suffer the effects of atherosclerosis, or hardening of the arteries, one of which is a weakening of the heart muscle caused by the diminished oxygenation which results from inhibition of the blood flow as the arteries narrow. Because the doctor considered it probable that Lauderdale's problem was caused by a weakening of the heart muscle, he decided not to conduct tests into the cause at that time and he prescribed digoxin, a medication which would mitigate the condition of congestive heart failure caused by a weakened heart muscle.

On Lauderdale's chart the physician made the note "recheck next week." At trial, the doctor testified that, as far as he could remember, he told Lauderdale to come back to the clinic in a week for another follow-up appointment. When asked if he had told Lauderdale he might be suffering from congestive heart failure, the physician said that, while he could not distinctly remember having told Lauderdale he suspected a heart problem, he is generally forthright with patients about their problems and about his diagnostic uncertainty and therefore he could not see why he would not have told this patient of his suspicions. The court, however, has no evidence that an appointment was scheduled for a follow-up visit for Lauderdale after September 25, or for any tests to determine the cause of his suspected heart condition.

Testimony at trial indicated that the cause could have been reliably determined through a fairly simple series of tests. A determination as to the underlying cause of congestive heart failure unquestionably affects the treatment a physician prescribes. A treatment such as digoxin for congestive heart failure resulting from weakening of the muscle, for example, would have no remedial effect upon congestive heart failure caused by a malfunction of the heart valves. Therefore, misdiagnosis of the cause of this condition can in some cases be as catastrophic as misdiagnosis of the condition itself, since both errors result in the failure to prescribe an appropriate treatment.

On October 10, 1984, Lauderdale was brought by ambulance to the Maxwell emergency room; he was complaining that he could not breathe. Lauderdale's condition deteriorated rapidly, and he died in the emergency room. Lauderdale's death was caused by congestive heart failure triggered by a malfunction of the mitral valve of the left atrium of his heart.* The family

---

\* The autopsy report actually revealed that Lauderdale died from congestive heart failure triggered by mitral valve malfunction, *in combination with atherosclerosis.* The court has, however, viewed the mitral valve malfunction as the sole cause of his death, because the evidence established that his atherosclerosis merely aggravated the mitral valve malfunction and that, had Lauderdale's mitral valve defect been properly diagnosed and treated, Lauderdale would have lived significantly longer.

physician who treated Lauderdale had, therefore, misdiagnosed the cause of Lauderdale's illness as a weakened heart muscle, and, as a result, the physician had also inappropriately treated the illness with digoxin.

The family practitioner testified forthrightly at trial that, at the time of Lauderdale's visits to the clinic, doctors there generally saw between 25 and 45 patients each day. He said that, in his opinion, this was too many patients for a doctor to handle, and that such overload impeded the doctors' ability to follow up on patient care and to talk to patients at any length about their treatment. The doctor implied that this patient overload resulted in a difference between the quality of care that it was possible to achieve at the Maxwell clinic and that which was generally adhered to in private practice. He said that medical care in the air force was "different" from what it was in civilian life, because there were so many patients and so few physicians. "We had to do the best we could do," but it was simply impossible to give the patients the individual attention they needed for as long as they needed it, he testified. He said much of the "personalness" usually characteristic of family medicine was inevitably lost in such a setting.

Also, the system by which the clinic operated at Maxwell limited the doctors' power over scheduling of follow-up appointments. Each doctor was free to schedule only two of his or her approximately 35 daily patients for follow-up examinations. All other appointments had to be scheduled through a central office which testimony showed had a three week to three month backlog generally. The only alternative for a patient who needed to be rechecked by one of the clinic doctors but who could not get a timely appointment was to visit the clinic on a walk-in basis and wait around until one of the doctors could manage to work the patient into his or her schedule.

## II.

In a Federal Tort Claims Act case, the court must apply the appropriate law of the forum state to determine liability. 28 U.S. C.A. §§ 1346(b), 2674; *see, e.g., Kitchens v. United States,* 604 F.Supp. 531 (M.D.Ala. 1985). Accordingly, the court turns to Alabama law.

Alabama law requires that physicians in the state meet the following standards of care:

(a) In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community.

(b) Neither a physician, a surgeon, a dentist nor a hospital shall be considered an insurer of the successful issue of treatment or service.

1985 Ala.Code § 6–5–484. According to the Alabama Supreme Court, the "same general neighborhood" by whose standards courts must evaluate doctors' care refers to the "national medical community." *Lamont v. Brookwood Health Services,* 446 So.2d 1018, 1020 (Ala.1983); *May v. Moore,* 424 So.2d 596, 600 (Ala.1982); *Drs. Lane, Bryant, Eubanks & Delaney v. Otts,* 412 So.2d 254, 257–58 (Ala.1982) (per curiam). Moreover, negligence—that is, the failure to meet such standards—almost always must be shown by expert testimony, *Gilbert v. Campbell,* 440 S.2d 1048, 1049 (Ala. 1983); *Zills v. Brown,* 382 So.2d 528, 531 (Ala.1980) (per curiam); and, before a plaintiff may prevail, the evidence must establish that the negligence proximately caused the injury. *Williams v. Bhoopathi,* 474 So.2d 690, 691 (Ala.1985). The court applies these principles here.

Mrs. Lauderdale claims that the treatment her husband received at the Maxwell family clinic deviated from the applicable standards of care of the national medical community. She contends that his treating

physician was negligent in treating her husband's suspected congestive heart failure without first determining what the cause of the condition was. The United States disagrees with this assessment, arguing that the treatment Mr. Lauderdale received was within the range of acceptable standards of care and was in no way negligent. In the alternative, the United States asserts that, even if the treatment Lauderdale received was negligent, he was contributorily negligent because he did not make a follow-up visit to the clinic during the week after September 25, as his treating physician had instructed him to do.

The expert testimony offered at trial diverges on the point of whether the treatment provided Lauderdale met the minimally acceptable standards of care of the national medical community. Mrs. Lauderdale's expert, a cardiologist, opined that the treating physician's failure to conduct the tests necessary to determine the cause of Mr. Lauderdale's suspected congestive heart failure contravened acceptable standards. Citing several diagnostic clues which should have been apparent from the tests given, he challenged the reasonableness of the treating physician's presumption that the heart problem was caused by muscle weakness. In the expert's view these clues should, at the very least, have prompted the treating physician to conduct some tests on September 25 to look further into the cause of Lauderdale's problem.

On the other hand, the expert who testified for the United States, also a cardiologist, said that Lauderdale's treatment fell within the acceptable standards of the medical community. He said that, due to the rarity of mitral valve malfunction as a cause for congestive heart failure, it was reasonable for the treating physician to act upon the presumption that the problem stemmed from heart muscle weakness. While the expert admitted that, as a cardiologist, he would not personally have undertaken a course of treatment for congestive heart failure without first ascertaining the cause of the problem, he said that a family practitioner at Maxwell's family practice clinic is in a position different from that in which a cardiologist affiliated with a

hospital would be. A cardiologist has greater, swifter access to the tools necessary for an assessment of the cause of congestive heart failure than does a family practitioner at a busy air force clinic, he said. He stated that a physician's decision to proceed initially by conducting sophisticated tests that look to the cause of the problem is the product of a more modern, expensive approach, but that that should not necessarily render unreasonable the older approach used in Lauderdale's case.

After careful review of the testimony, the court finds that acceptable standards of medical care for treatment of a condition such as Lauderdale's require a treating physician situated similarly to Lauderdale's physician to follow one of two courses: that the treating physician perform the tests necessary to determine the cause of congestive heart failure before embarking upon a course of treatment; or that, if the doctor chooses not to determine the cause of the condition before attempting to treat it, thus taking the risk that the problem will go completely without treatment until the patient returns for a follow-up visit, then the physician bears the responsibility of strongly impressing upon the patient that he received only a tentative treatment for a suspected serious heart condition and that the patient must return within a short time so that the doctor can assess the effectiveness of the treatment.

■ Since there is no question here but that the treating physician made a decision not to conduct further tests to inquire as to the cause of Lauderdale's congestive heart failure, the court has been left to assess whether the treatment received met acceptable medical standards by determining what Lauderdale was told about his treatment and what he understood to be the nature and severity of his condition when he left the family practice clinic on September 25. The court is convinced that, while the doctor informed Lauderdale that he was considering the possibility of a heart problem, the doctor did not convey his suspicions to Lauderdale in a way that made clear to him that his was a potentially severe heart problem, and he did not im-

press upon Lauderdale that the treatment prescribed for him that day was a tentative one and that it was mandatory that he return in one week so the physician could assess the effectiveness of his prescribed course of treatment. The court is convinced that Lauderdale left the September 25 visit with the understanding that the disclosed diagnosis was still a mild form of pneumonia and that the doctor was treating him for this mild illness.

The United States claims that Lauderdale was contributorily negligent because he did not return to the clinic during the week following September 25, as his physician instructed him to do. The experts agreed that, if Lauderdale had returned to the clinic at the start of October and if the doctor had then conducted the requisite tests to determine the cause of his heart problem and treated it accordingly, Lauderdale would probably not have died. But the court disagrees that Lauderdale's failure to return to the clinic constituted contributory negligence in light of the insufficient warning given him of the urgency of his need to return.

■ In reaching this conclusion, the court has considered the treating physician's testimony that there was no reason why he would not have told Lauderdale of his new diagnosis. The court has also noted that the doctor wrote the words "recheck next week" on Lauderdale's chart. However, in the court's view these factors do not indicate that the physician made clear to Lauderdale that there was any newly realized sense of jeopardy to be associated with his troubled sleep. Rather, Lauderdale was dealt with as he had been during his two previous visits to the clinic, and told to come back for a follow-up just as he had been on his previous visits. No appointment was scheduled. No mention was made of a series of tests that might be needed to determine the cause of his heart problem. There was nothing that would have distinguished in Lauderdale's mind the importance of his return to the clinic the next week. The court is convinced that Lauderdale thought he would need to return to the clinic only if he were in more

acute distress—if his problems got worse. He thought that as to his existing symptoms, he was being cared for.

Based upon the foregoing, the court finds that the treatment the family clinic physician provided to Lauderdale was negligent in that it did not meet the minimally acceptable standards of the national medical community. The treating physician's failure either to conduct immediately the tests necessary to probe the cause of Lauderdale's heart condition after it was diagnosed or to impress strongly upon Lauderdale that it was important and necessary that he return to the clinic within a week for a follow-up examination, rendered the treatment inadequate. The court also finds that the physician's negligence proximately caused Lauderdale's death; the court is convinced that but for the physician's negligence Lauderdale could have been successfully treated. Moreover, Lauderdale was not contributorily negligent by not returning to the clinic; he had not been given sufficient notice that his return was essential to his well being.

In so ruling, the court does not place the blame for Lauderdale's death solely upon the family physician who treated him. The evidence reflects that, due to patient overload and inadequate physician control over follow-up care, the Maxwell family clinic provides substandard care to its patients and, in particular, provided substandard care to Lauderdale. Once a clinic, such as Maxwell's, sets itself up as a health care provider, it is bound by law to provide medical services that meet the standards of care of the national medical community. To allow otherwise misleads patients into believing they are receiving competent care when they are not and, thereby, further misleads them into unknowingly and dangerously gambling with their health.

### III.

The Federal Tort Claims Act provides that recovery against the United States may be had to the same extent as would be allowable against "a private individual under like circumstances," except that "interest prior to judgment" and "punitive dam-

ages" are not recoverable. 28 U.S.C.A. § 2674. State law is employed for measurement of such recovery. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Ross v. United States*, 640 F.2d 511, 518–519 (5th Cir. January 19, 1981) (Unit B). But where state law limits recovery in wrongful death cases to punitive damages, § 2674 provides that actual or compensatory damages may be had against the United States, as "measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefits the action was brought, in lieu thereof." Since Alabama law limits recovery in wrongful death cases to punitive damages, 1975 Ala.Code § 6–5–410; *Lowe v. General Motors Corp.*, 624 F.2d 1373 (5th Cir.1980), this latter provision is applicable to the instant case. *Massachusetts Bonding & Ins. Co. v. United States*, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956); *Hoyt v. United States*, 286 F.2d 356 (5th Cir.1961); *Edwards v. United States*, 552 F.Supp. 635, 639 (M.D.Ala.1982).

In *Hoyt*, the former Fifth Circuit considered the types of damages recoverable under § 2674 and how these damages are measured. The court noted that these issues are properly resolved according to federal rather than state law, and the court determined that the proper measure of damages under the Federal Tort Claims Act is the amount "equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased." 286 F.2d at 359, *quoting Chesapeake & Ohio Railway Co. v. Kelly*, 241 U.S. 485, 489, 36 S.Ct. 630, 631, 60 L.Ed. 1117 (1916). Included in this assessment should be "loss of services," but not "grief, loss of society or companionship." *Id.*, at 360. "Loss of services" has been interpreted to include "(s)ervices the decedent performed at home or for his spouse." *Edwards v. U.S.*, 552 F.Supp. 635, 640 (M.D.Ala.1982), *quoting Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 585, 94 S.Ct. 806, 815, 39 L.Ed.2d 9 (1974).

■ Here, the parties have stipulated to the reasonableness of the amounts of eco-

nomic loss Mrs. Lauderdale claims she and her family suffered. Adjusted income losses from labor and air force retirement income are assessed at $142,407.43. The value of lost household services is assessed at an additional $19,949.37, for a gross economic loss of $162,356.80. The only other loss for which Mrs. Lauderdale asks recovery is that of the funeral expenses incurred, which she estimates at $2,500. The court agrees that all of these damages and expenses are reasonable and justified and therefore finds that the evidence sustains a total damage award of $164,856.80.

A judgment will be entered in accordance with this opinion.

### JUDGMENT

In accordance with the memorandum opinion entered by the court today, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of the plaintiff Dorothy M. Lauderdale, as administratrix of the Estate of Donald L. Lauderdale, deceased, and against defendant United States of America; and

(2) That plaintiff Dorothy M. Lauderdale, as administratrix of the Estate of Donald L. Lauderdale, deceased, have and recover from defendant United States of America the sum of $164,856.80.

It is the further ORDER of the court that costs be and they are hereby taxed against defendant United States of America, for which execution may issue.