**Rosa Irene CAMPOS VIUDA DE COURTOIS, Marta Courtois De Padro, Hector Anibal Courtois Campos, Carlos Roberto Courtois Campos, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 87–00868 GG.

United States District Court, D. Puerto Rico.

Oct. 7, 1991.

Harvey B. Nachman, Santurce, P.R., for plaintiffs.

Richard L. Clark, Sr. Trial Atty., Torts Branch, Civ. Div., Steven J. Riegel, Richard R. Nevitte, Jr., Debra Denise Finnerty, U.S. Dept. of Justice, Miguel A. Fernandez, Asst. U.S. Atty., and Andrew J. Dilk, Chief Counsel's Office, Federal Aviation Admin., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIERBOLINI, Chief Judge.

On July 22, 1986, a twin-engine Douglas DC–3 registered as N27PR crashed in the San José lagoon less than one mile away from the runway of San Juan International Airport. The widow and children of the deceased pilot and the co-pilot, his wife, and their conjugal partnership brought this suit against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, claiming that the cause of the tragic crash was the negligence of the Federal Aviation Administration's local air traffic controllers. The United States denied liability asserting that the responsibility for the crash lay with the pilots of N27PR.

Having considered all of the evidence submitted and after eight (8) days of trial, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. On July 22, 1986, N27PR, an old DC–3, with newly rebuilt engines, was scheduled to fly cargo from San Juan International Airport to St. Kitts, West Indies. November 27 Papa Romeo, as the plane was known in air traffic jargon, was reg-

istered to Diaz Aviation Corporation. The pilot of the plane, Héctor Courtois, had logged more than 29,000 hours in the air and had an impressive record. The co-pilot, Caleb Edgardo Figueroa, was duly qualified for commercial, multi-engine, and instrument flight. The crew of N27PR, Courtois and Figueroa, had made two emergency landings in the previous two months flying DC–3s with cargo.

2. Under Federal Aviation Regulations, the crew had to determine and fill out an accurate "weight and balance" form. Instead, the crew followed the policy of its employer, namely, to use maximum weights for the cargo compartments, and standard weights for the pilot and the co-pilot. No accurate determination of the weight and balance of the cargo was available after the crash due to the loss of the cargo.

3. The San Juan International Airport has two runways—one positioned on an axis 80′–260′ ("runway 8") and the other on an axis of 100′–280′ ("runway 10"). Since the prevailing winds at San Juan are from the east, virtually all departures and landings are made toward the east on 8 and 10.

4. The Airport Tower controls all traffic within the terminal zone. The Tower has four positions, the ground controller, the local controller, who directs take-offs and landings, the flight service controller, who issues meteorological and en-route information and a cab controller, who is there to supervise and assist. The first three controllers have a separate radio frequency and button intertelephones which enable them to converse directly with the Approach and Departure Radar at the San Juan Combined Enroute Approach control ("CERAP").

5. N27PR contacted the ground controller for instructions and was given permission to taxi to the departure end of runway 8 and wait. Upon reaching that point, co-pilot Figueroa switched into the frequency of the local controller and requested clearance for take-off. At 17:43:12, November 27 Papa Romeo began its take-off roll. The initial take-off was routine.

6. At 17:46:00, N27PR received approval to change frequency. Shortly thereafter, the crew of N27PR noticed engine roughness while climbing through 300 feet of altitude. The engine power was reduced to METO ("Maximum Except Take Off"), but the engine continued to vibrate. N27PR continued to climb until it reached about 600 feet at which time the engine had become so rough that it was turned off and feathered.[1] Co-pilot Figueroa agreed in his testimony that this was an emergency.

7. About two minutes elapsed, as the crew shut down and feathered the right engine, turned back to the airport, performed the engine failure checklist, and contacted R2 San Juan Approach (the "Radar Controller") at CERAP.

8. At 1748:11, co-pilot Figueroa made initial contact with the Radar Controller by stating: "San Juan Approach Douglas Two Seven Papa Romeo." The Radar Controller replied: "Douglas Two Seven Papa Romeo, San Juan Approach. Squawk Zero–Four Three Five and Ident." This simply meant that the co-pilot was to switch the controls to those numbers and make sure the transponder was in the "on" position. At this time, N27PR was approximately six miles to the east of the airport. A reasonable and prudent crew would have notified air traffic control of the engine vibration as a potential emergency and would have selected the 7700 emergency code on their transponder.

9. Instead, at 17:48:29, co-pilot Figueroa notified the Radar Controller: "San Juan Ground Douglas two seven Papa Romeo; We are coming back to the airport." The word "ground" in the previous transmission was wrong, so the Radar Controller stated: "Douglas Two Seven Papa Romeo, this is San Juan Approach, sir. Squawk Zero Four Three Five." Co-pilot Figueroa immediately replied: "Zero Four Three Five." At 17:48:56, the Radar Con-

---

1. To feather an engine is to turn the blade of the propeller "on its shaft so that its leading and trailing edges are nearly parallel with the air-plane's line of flight, thus offering minimum resistance or drag when idle." *Webster's New World Dictionary* (1972 2nd ed.)

troller announced: "Six Seven Papa Romeo's radar contact, a mile West of Loíza River mouth, fly heading Two Five Zero vectors for, uh, right traffic runway One Zero."

10. Aircraft making initial contact with Approach Control do so twenty or more miles from CERAP. N27PR was about six miles from the airport and CERAP. Mr. Negrón testified that the only aircraft that would enter the terminal area from the vicinity of the Loíza River mouth are military helicopters. He testified that it was very unusual to see a plane there. Perhaps the Radar Controller should have asked N27PR if they were having any problems, but the Air Traffic Controllers Manual does not require this type of inquiry and we must defer to the expertise of the controllers who prepared it.

11. A crew confronted with an emergency has the authority under the Federal Aviation Regulations ("FAR") to fly straight-in and land on any runway, regardless of any clearance or communication difficulties. These regulations set forth the overall responsibility of the pilot in command (FAR 91.3(a)); the pilots' authority to deviate from clearances as necessary (FAR 91.3(b)), and the right of way of an aircraft in distress over all other aircraft (FAR 91.67(b)).

12. Co-pilot Figueroa agreed that an engine failure is an emergency and he admitted that he knew he was authorized to land on any runway without a clearance from the tower. Plaintiffs' expert Mr. McDermott also agreed, testifying that: "[t]he pilot always, always has the authority to disregard a clearance or an instruction from the controller." [2] In sum at all times during the emergency, the crew had the emergency authority to make a straight-in approach and landing on the closest runway, runway 28.

13. Co-pilot Figueroa's fourth radio transmission to Radar Control, at 1749:05, was garbled and unintelligible. At 17:49:49, co-pilot Figueroa made his fifth

communication with the Radar Control and the transmission reads: "San Juan Approach Douglas two seven Papa Romeo" and the remainder is unintelligible. The Radar Controller replied: "The aircraft calling San Juan is completely unreadable." Even co-pilot Figueroa, who made the transmission, agreed after hearing the tape that the transmission was indecipherable. He testified: "I think that I heard a part where I had a problem, but on that tape you can't understand." Nevertheless, plaintiffs' expert, Mr. McDermott, declared that the communication stated: "San Juan Approach Douglas 27–Feathering the prop, we've engine trouble." Mr. McDermott's testimony that the additional words are audible and intelligible is not credible.[3]

14. At 17:49:59, the Radar Controller contacted the Tower Controller on the hot line and arranged with the local controller a close downwind approach. At 17:50:06, the Radar Controller told N27PR: "Douglas Seven Papa Romeo; Keep your speed up to the field. Close downwind is approved, sir, you can contact tower, eighteen three." N27PR reply at 1750:08 is unintelligible. The Radar Controller responded: "That's Douglas two seven Papa Romeo."

15. The Radar Controller never told the Tower Controller that N27PR had decided to come back to the airport and that the last two transmissions from the aircraft were unintelligible.

16. Co-pilot Figueroa made three transmissions at 17:50:18, 1750:27, and 1750:50, that may have been attempts to notify the controllers of the existence of the emergency, but all three transmissions were completely unintelligible to the controllers.

17. At 17:50:23, the Tower Controller asked: "Is that Douglas two seven Papa Romeo calling the Tower." After a garbled and unintelligible response the Tower Controller stated at 1750:33: "Aircraft calling the tower be advised your transmission uhh broken and unreadable." At 17:50:40, the Tower Controller stated: "two seven

2. Plaintiffs' other expert, Mr. McClure, also agreed in testimony that Captain Courtois had the authority to land in runway 28.

3. Not even plaintiff's enhanced version of the tape is intelligible.

Papa Romeo if you hear the Tower key your mike twice." After another jumbled response, the Tower Controller asked again at 1751:13: "Douglas two seven Papa Romeo if you hear the tower key your mike twice." Seven seconds later, N27PR clicked the mike twice.

18. Pilots are trained that selection of the 7700 emergency code will trigger an alarm, and that in an emergency they should "squawk" 7700 first and then attempt to establish radio communications with air traffic control. Since the crew was unable to communicate with the Tower, they should have switched their transponder to code 7700. This would have flashed a emergency signal that would have been seen on any radar scope in the region.

19. At 1751:22, the Tower controller told N27PR: "Douglas seven Papa Romeo Cleared to land runway one zero wind zero five zero at one zero if you hear me key your mike twice." Two clicks on the mike were heard. About fifty seconds, later N27PR crashed in the San José lagoon.

20. If the crew had flown straight in to runway 28, N27PR would have successfully reached the airport, as evidenced by the fact that the plane did fly past the approach end of runway 28. Instead, N27PR followed the instructions of the Tower Controller, who was not aware of the emergency.

21. Furthermore, co-pilot Figueroa testified that a properly flown emergency pattern would have been wider and higher than a normal approach pattern. In testifying that the normal traffic pattern altitude was 1000 feet, co-pilot Figueroa conceded that the emergency approach was definitely started lower than it should have been. Also, the crew of N27PR set up for a close downwind instead of flying a wide pattern, as is recommended for a single engine approach.

22. In the previous two months, the crew of N27PR had experienced two engine failures on DC–3s.[4] If N27PR had "squawked" the 7700 emergency code at the time the pilots shut down the right engine, or at any time thereafter, the CERAP and San Juan Tower would have immediately been aware the aircraft was declaring an emergency.

23. The crew failed to fulfill its duty under the Federal Aviation Regulations to determine and fill out an accurate "weight and balance" form. (FAR 91.5; FAR 135.-63(c)). Instead, the crew used "canned" weights without determining the actual weights, and they did not supervise the loading.

24. A DC–3 should be able to fly and maintain altitude on one engine. The fact that N27PR could not maintain altitude and was porpoising[5] suggest that it was probably loaded improperly, out of the proper center of gravity. However, there is no conclusive evidence that this was in fact a cause of the accident.

## CONCLUSIONS OF LAW

25. Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the United States may be held liable for the negligent acts or omissions of its employees while acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred.

26. The Civil Code of Puerto Rico defines the standard of fault and recovery in this case. Article 1802 of the Civil Code provides:

> A person who by act or omission causes damages to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not

4. Actually, defendants' pilot expert, Mr. Coxey, testified that Captain Courtois had emergencies involving engines failing in DC–3s on four prior occasions.

5. Porpoising is a maneuver in which a pilot repeatedly lowers the nose of the airplane, and

dives to a slightly lower altitude, in order to increase the airspeed. It is used when an aircraft with one engine inoperative is unable to maintain minimum controllable airspeed (VMC) despite full power on the remaining engine.

exempt from liability but entails a reduction of the indemnity.

31 L.P.R.A. § 5141.

■ 27. Under Article 1802, if both the plaintiff and defendant are at fault, the plaintiff can still recover, but his recovery is limited to the proportion of the damages sustained by the plaintiff that were proximately caused by the defendant's negligence. *See, e.g., Montero Saldaã v. American Motors Corp.*, 107 D.P.R. 452 (1978).

■ 28. The Federal Aviation Administration has published regulations ("FAR") that govern the operation of airplanes by pilots. These regulations have the force of law. *See, e.g., Tilley v. U.S.*, 375 F.2d 678, 680 (4th Cir.1967).

29. The FARs establish that the pilot in command of an aircraft is the final authority for the safety of the operation of his aircraft. Federal Aviation regulation 91.-3(a) provides that "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to the operations of that aircraft." 14 C.F.R. § 91.3(a).

■ 30. The FAA also publishes the Airman's Information Manual ("Manual") to instruct pilots in the application of the FARs in various situations. The Manual is evidence of the standard of care among all pilots. *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180–81 (5th Cir.1975).

31. The Manual essentially repeats the contents of the FAR regarding pilot responsibility and authority during an emergency.

440. PILOT RESPONSIBILITY AND AUTHORITY

a. The pilot in command of an aircraft is directly responsible for and is the final authority as to the operation of that aircraft. In an emergency requiring immediate action, the pilot-in-command may deviate from any rule in the FAR, Subpart A, General, and Subpart B, Flight Rules, to the extent required to meet that emergency. (FAR–91.-3(b)).

32. N27PR was involved in a Part 135 operation, described by the First Circuit in

*Federal Express Corp. v. United States*, 664 F.2d 830 (1st Cir.1981), and as such could not, pursuant to 14 C.F.R. §§ 135.3, 135.99(a) and 135.109, be operated by less than a minimum flight crew of two pilots.

33. Both pilots were required to be aboard for the operation of N27PR, and as seen in *Federal Express, supra,* at 837, both crewmembers were responsible for knowing the airport runway layout and operation of the aircraft in both normal and emergency conditions.

34. Pursuant to the certification standards of both pilots found in 14 C.F.R. § 61.63(d)(3)(i) and Subparts G and H of Part 135, both pilots had previously been trained, tested, and certified for their multi-engine rating to meet the requirements for conducting flight in N27PR *after* the loss of one engine.

35. The pilots' responsibility and authority remain the same during normal operations and during emergency operations. Pilots are given wide latitude in the actions they may take in dealing with an emergency:

> In an emergency requiring immediate action, the pilot in command may deviate from any rule of this subpart or of Subpart B to the extent required to meet that emergency.

14 C.F.R. § 91.3(b).

36. Included in the deviations that pilots may make from the FARs during an emergency is the authority to deviate from and Air Traffic Control ("ATC") clearance, even when in controlled airspace.

> When an ATC clearance has been obtained, no pilot in command may deviate from that clearance, except in an emergency, unless he obtains an amended clearance....

14 C.F.R. § 91.75(a).

> Except in an emergency no person may, in an area in which air traffic control is exercised, operate an aircraft contrary to an ATC instruction.

14 C.F.R. § 91.75(b).

■ 37. Such deviation authority includes refusing to comply with an ATC

clearance if complying with that clearance would endanger the safety of the aircraft. *In re N–500L Cases,* 691 F.2d 15 (1st Cir. 1982); *New Hampshire Ins. Co. v. U.S.,* 641 F.Supp. 642 (D.P.R.1986), *aff'd,* 838 F.2d 595 (1st Cir.1988); *Delta Air Lines, Inc. v. United States,* 561 F.2d 381, 392 (1st Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

38. Air traffic controllers are required to comply with the mandatory provisions of the Air Traffic Control Manual FAA 7110.-65D to provide for the safe, orderly, and expeditious flow of traffic. 14 C.F.R. § 65.45(a). An emergency may be declared by either the pilot or by personnel of a Federal Aviation Administration facility. Air Traffic Control Manual, FAA 7110.65D, Section 9–15.

■ 39. In the "forced handoff",[6] the Radar Controller never advised the local controller that the plane was returning to the field, nor that communications had deteriorated to the point of being unintelligible. Although the deterioration of radio transmission does not by itself put a reasonable controller on notice that an aircraft is in emergency status, since the Radar Controller testified that it was unusual for an aircraft to depart and to return immediately, he should have perceived that N27PR was experiencing some type of problem. His failure to convey important information, particularly the deteriorating transmissions from N27PR, was negligent and contributed to causing the crash of N27PR. If the Radar Controller was not reading the radio transmissions from N27PR, it is unreasonable for him to expect the Tower Controller to give N27PR proper clearance to land. The Tower Controller sensed that something was wrong with N27PR because she asked another controller, Mr. Negrón, to look out of the picture window for N27PR. If she would have received more information, for example, that the N27PR was returning shortly after take-off and that its radio communications were unintel-

ligible, the Tower Controller may have been put on notice that N27PR was in emergency status. Instead, crucial seconds were lost while the Tower Controller attempted to establish if the aircraft making the unintelligible transmissions was N27PR.

■ 40. Nevertheless, the primary responsibility for the crash lies with the crew of N27PR. Neither the Radar Controller nor the Tower Controller actually knew that N27PR had an emergency because the pilots failed to notify them, either orally or by "squawking" 7700. The pilots should have declared an emergency, switched the transponder into 7700 and informed air traffic control of their decision to land straight-in on runway 28.

41. Two months prior to the accident, the crew of N27PR had two emergency landings. In the first emergency landing, the right engine of N29PR, a DC–3, failed about four miles to the east of Puerto Rico. The crew landed N29PR at the airport at Roosevelt Roads after coordinating with the CERAP.

42. In the second emergency landing, about one-month before this tragic accident, the right engine of another DC–3, N28PR, failed about three hundred feet after take-off. The crew turned off and feathered the engine and called the San Juan Tower to inform that they wanted to land straight-in on runway 28. The Tower immediately granted N28PR permission to land straight-in on runway 28 and they made a successful emergency landing. Given these two emergency landings due to engine failure, the pilots of N27PR knew or should have known the emergency procedure available to land the N27PR.

43. Assuming that N27PR did in fact declare an emergency, the timing was too late. The electrical system had deteriorated to the point that the radio transmissions from N27PR were unintelligible.

---

**6.** This is the term used by defendants' air controller expert, Mr. Queri, to describe the communication from the Radar Controller to the Tower Controller at 17:49:59, arranging for a close downwind approach for N27PR. Mr.

Queri testified that forced handoff in air traffic jargon means that the tag of an airplane is electronically shown in the BRITE radar indicator in the control tower.

After several futile efforts to communicate with the controllers,[7] and given the failed engine and that the controllers were obviously not understanding them, the crew of N27PR should have "squawked" 7700 and/or landed straight into runway 28, particularly since N27PR was flying at such low altitude and at such proximity to the runway.

44. Finally, even when the crew of N27PR elected not to land in on runway 28, they failed to enter a downwind wide enough for an airplane with one inoperative engine.

45. Based on all the evidence, the court finds that the negligence attributable to both pilots jointly and severally is 80%. The negligence attributable to the defendant is 20%.

The actual damages will be determined at a later trial. A trial setting conference is hereby scheduled for November 1, 1991 at 9:30 a.m.

SO ORDERED.

---

**7.** The Transcript of the recorded communications show that at 17:49:05, at 17:49:49 and at 17:50:08, the transmissions from N27PR to the Radar Controller were unintelligible. The transcript of the recorded communications show that at 17:50:18, at 17:50:27 and at 17:50:50, the transmissions from N27PR to the Tower Controller were also incomprehensible.